909 A.2d 775

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Thomas J. GORBY, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 27, 2003.

Decided June 20, 2006.

Dennis Ralph Paluso, Esq., Billy Horatio Nolas, Esq., Washington, for Thomas J. Gorby.

Michael Joseph Fagella, Esq., Amy Zapp, Esq., Washington, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice SAYLOR.

After multiple remands in this capital post-conviction appeal, we resolve Appellant's layered claim of ineffective assistance of counsel deriving from his trial counsel's investigation and presentation of sentencing mitigation.

The background underlying Appellant's conviction for first-degree murder and subsequent death sentence is set forth in *Commonwealth v. Gorby,* 527 Pa. 98, 588 A.2d 902 (1991). Briefly, the killing occurred in December 1985 after Appellant asked Drayton Spahr, the victim, for a ride from one tavern to another. Upon arrival, Appellant killed Mr. Spahr in his car, using a knife. Later, Appellant appeared at both taverns in clothes bearing markings from dried blood and displayed the victim's wad of money, distinctive belt, and wallet. *See id.* at 104–05, 588 A.2d at 904–05. At one point, Appellant produced his bloodstained knife and used it to shave hair from a bartender's arm; in statements to police, witnesses characterized Appellant's appearance and behavior as highly irregular.

In preparing for the penalty phase of trial, Appellant's trial counsel was aware that: there were accounts of his client having behaved irrationally around the time of his offenses; Appellant had abused intoxicating substances from the time of his early youth; he had a "rough childhood"; he performed poorly in school and in educational testing despite normal intelligence; he had had various encounters with the juvenile justice system; and he had been hospitalized on one or more occasions, including as a result of a head injury suffered in an automobile accident at 18 years of age. Nevertheless, counsel did not believe that any of these circumstances represented, or presented a basis for further inquiry into, potential mitigation.

Trial counsel formed his conclusion largely based on his interviews with Appellant and his mother, Betty Stevens, and step-father, Gilbert Stevens. He did not obtain medical, educational, or social-history records, nor did he consult a mental-health professional during his investigation and preparation.

Immediately after Appellant's conviction and prior to the penalty phase of trial, Appellant's trial counsel appeared to express some uncertainty in terms of the presentation of mitigating circumstances at a capital trial.[1] Counsel proceeded to offer a single mitigation witness, Appellant's step-father, whose entire direct testimony proceeded as follows:

Q   Would you state your full name for the record please.

A Pardon me?

Q   State your full name for the record.

A Gilbert L. Stevens

Q   And what is your address?

A R.D. 2, Box 110, Eighty–Four, Pa.

Q   What is your relationship to Mr. Gorby?

A He's my stepson.

Q   Prior to December 21st, 1985, within the few months immediately prior to that, was he working with you or for you?

A He worked for me.  We cut wood and stuff like that around the house.  He helped me build my home.

Q   What kind of work would he do for you when he was helping you build your home?

A We laid the block; most of the block he helped me with and roughed in the decks.  The walls I put up later.

1.  For example, the following interchange occurred between counsel and the court:

[COUNSEL]: What you are saying then, as far as our mitigating circumstances, that are you going to introduce it or are we going to introduce it?

[THE COURT]: No, you have to introduce it.  How can I introduce it? ...

N.T., at 1074; *see also id.* at 1061–62 (reflecting counsel's indication that he needed a book to address aggravating and mitigation circumstances, as well as the trial court's remark, "I don't know what the mitigating circumstances are.  He said he is going to read the book.").

Q   What kind of a worker was he?

A   He worked with me all day long.  He worked pretty hard, I'd have to say a good worker.

Q   Would he work with you on a regular daily basis?

A   Pardon me?

Q   Would he work with you on a regular daily basis?

A   No. If I asked him to do something he would always give me a hand.  He never refused unless he had somewhere to go or something to do.

Q   Your Honor, I have no other questions.

N.T., at 1097–98.

In his brief closing penalty-phase argument before the jury,[2] Appellant's trial counsel suggested that it could be inferred from the circumstances surrounding the killing that Appellant had been drinking;  contended that the Commonwealth had not established a motivation or precipitating event relative to the killing;  reminded the jurors of the gravity of their decision and the difficulty of counsel's own position;  entreated them not to make a mistake;  and referenced the mitigation evidence that he had presented solely on the following terms:

> You heard testimony of Gilbert Stevens now, who is the stepfather, you have heard the testimony of Betty in the case.  Again this doesn't count here.  What counts is the testimony that Mr. Stevens gave you.

N.T., at 1102.[3]  Counsel sought and obtained a charge describing the mitigating circumstance delineated in Section 9711(e)(3) of the death penalty statute, prescribing that mitigating circumstances shall include the capacity of a capital defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, 42 Pa. C.S. § 9711(e)(3), but he did not frame the evidence in such

---

**2.**   The argument spans less than three pages of the trial transcript.

**3.**   Counsel's reference to the testimony of "Betty" is to the fact-based testimony of Appellant's mother adduced during the guilt phase concerning Appellant's whereabouts and appearance before, at, and/or after the time of the killing.  *See* N.T., September 1986, at 876–90.  As is reflected in counsel's acknowledgement, above, such evidence bore no relevance to the development of any mitigating circumstance at the penalty phase.

terms in his closing remarks to the jury. Moreover, in its charge to the jurors, the trial court did not mention the catch-all mitigator authorizing consideration of "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense," 42 Pa. C.S. § 9711(e)(8), and counsel voiced no objection, although this was the only category of mitigation within which the affirmative evidence that counsel had presented in the penalty phase potentially could be assessed. The jurors unanimously found the aggravating circumstances alleged by the Commonwealth to have been established beyond a reasonable doubt,[4] and each juror determined that Appellant had failed sufficiently to establish any mitigating circumstance, thus requiring the imposition of a death sentence. *See* 42 Pa.C.S. § 9711(c)(1)(iv) (prescribing that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances").

In January 1996, Appellant filed a petition for relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546, which was supplanted by an amended petition filed by appointed counsel. Appellant averred, *inter alia*, that his trial counsel failed to investigate, develop, and present mitigating evidence concerning his life history and mental-health condition, including evidence of abuse and neglect suffered during his childhood and major mental health impairments, for example, cognitive disorder diminishing, *inter alia*, his ability to reason, make sound judgments, and control impulses. According to the petition, the "good worker" evidence that counsel did actually adduce was paltry and dwarfed by the other available and compelling mitigation. The petition averred that counsel's deficient stewardship stemmed from his failure to undertake a sufficient and reasonable mitigation investigation, in-

---

4. Those were that Appellant had committed the killing in the perpetration of a felony (robbery), *see* 42 Pa.C.S. § 9711(d)(6), and that he had a significant history of felony convictions involving the use or threat of violence to the person, *see* 42 Pa.C.S. § 9711(d)(9).

cluding failures to speak with readily available life-history witnesses, obtain medical and social history records, and explore mental-health issues that were obviously of potential relevance as indicated by the circumstances of Appellant's background and his offenses. Further, Appellant alleged that a mental-health expert, with knowledge of Appellant's violent, chaotic, and unhappy childhood, and his history of cognitive and psychological impairments, would have explained to the jury the long-lasting and debilitating effects of such conditions, including the impact on Appellant's affect and behavior, thus suggesting some lesser degree of moral culpability in terms of the decision whether to impose a life or death sentence. The petition also alleged that the abjectness of counsel's deficient performance was manifested by his confusion connected with the presentation of mitigation; his failure to adequately develop the mitigation claim deriving from Appellant's asserted intoxication; and the basic failure to obtain an instruction under Section 9711(e)(8) of the death penalty statute to furnish the jury with some framework for considering the limited evidence that counsel did adduce, or at least to lodge an objection to the omission of such charge. Finally, the petition averred that Appellant's counsel on direct appeal was ineffective for omitting from the appeal any challenge to trial counsel's stewardship, which allegedly would have required relief from the death sentence.

In support of his petition, Appellant submitted numerous declarations containing life-history and mental-health information within recognized categories of mitigation in capital sentencing proceedings. For example, the declarations included ones from Appellant's mother and two aunts attesting to his rearing in an impoverished, dysfunctional household;[5] Appellant's separation from his two sisters at an early age; verbal and physical abuse of Appellant throughout his early child-

---

5. *See, e.g.,* Declaration and Affidavit of Jim Buchanan at ¶ 5 (reflecting a statement by Appellant's brother that "[Appellant] was dragged from bar to bar with my mother and Lou. I saw him many times sleeping on bar stools or in the truck or car in the parking lot of the bar."); *id.* at ¶ 3 ("We would see our mother staggering drunk on a regular basis.... We were neglected by our mother due to her bad relationships with men and her drinking.").

hood, for example, in the form of frequent beatings by household members and sexual molestation by other persons; Appellant's witnessing of violent and life-threatening altercations between his mother and her several husbands that resulted in physical impairments to her, as well as Appellant's unsuccessful efforts as a youth to defend her on such occasions;[6] the discharge of firearms in the household as a fear tactic; Appellant's abnormal behavior in rocking and banging his head against walls and objects for several hours on multiple occasions; and the decision of Appellant's step-father to ultimately bar him from the household in his teenage years, rendering him homeless throughout a substantial portion of that period of his life. Most of these declarants indicated that trial counsel never spoke to them and that they would have been willing to testify on Appellant's behalf at trial; as to Appellant's mother, she acknowledged having had conversations with counsel, but she indicated that counsel never broached the subject of Appellant's background or childhood abuse with her, or asked her to testify in the penalty phase.

The central proffer of information concerning Appellant's mental health was contained in the declarations of three psychologists and a psychiatrist. These persons attested, fairly consistently, to having determined to a reasonable degree of professional certainty that, at the time that he committed his crimes, Appellant suffered from cognitive disorder (brain injury affecting thought process), major depression, post-traumatic stress syndrome, borderline personality disorder, and poly-substance abuse. Further, they indicated that

**6.** *See, e.g.,* Declaration and Affidavit of Shirley Denjen, at ¶ 3 (reflecting the statement by Appellant's aunt that he "was scarred by the violence in the home he lived in. Seeing his mother's face split open and her head split open and then seeing that she did nothing to get herself or him out of the situation had a bad effect on him. He wanted to protect his mother from these men but he was unable to. It hurt him to see his mother hurt."); Declaration and Affidavit of Jim Buchanan at ¶ 5 ("There were just so many fights in our house that we lived with the fear and the violence all the time."); Declaration and Affidavit of Roy Denjen at ¶ 6 (reflecting the statement of Appellant's uncle that "I was a city cop and I was used to dealing with domestic violence situations but it was sad that this was my wife's sister's house where the violence was going on").

such asserted impairments or conditions were exacerbated by the effects of a traumatic childhood, again, with substantial impact on reasoning ability, judgment, and behavioral control.

Additional declarations included one from a prison guard, describing Appellant's intervention to rescue him from serious injury or death in an incident in which a prisoner was choking the guard with a belt, and the statement of a juror from Appellant's trial reflecting his judgment that nothing meaningful had been presented at the penalty phase in terms of mitigation, as well as his indication that the development of facts concerning childhood abuse and neglect would have persuaded him that a life sentence was the appropriate punishment. The post-conviction proffer also included Appellant's medical records evidencing: an early incident of hospitalization, in which a physician noted that he suffered from malnutrition, dehydration, and jaundice possibly due to sepsis; Appellant's 1976 vehicle accident in which he suffered a "blow-out type fracture of the left orbit and lateral wall of the maxilla," reported memory loss, and exhibited drifting and poor responses of his eyes; educational records showing poor achievement and sub-normal performance testing; and juvenile records reflecting Appellant's status as a "loner," his report that his step-father barred him from the household during his teenage years, the indication of a juvenile counselor that "[r]ecords seem to verify [Appellant's] view-point inasmuch as they indicate the step-father to be negligent in his duties," and the counselor's statement that "[t]here does not seem to be any functioning going on in terms of social experience." The submission also included police reports containing witness statements regarding Appellant's unusual behavior after the killing.

Finally, Appellant presented a declaration from his trial counsel, attesting to the fact that Appellant's sentencing hearing was the first penalty phase proceeding in which he had served as a defense attorney,[7] and to his lack of preparedness, as follows:

7. Appellant's trial counsel previously had been employed as an assistant district attorney, and thus, did have substantial experience in handling criminal cases from the prosecution perspective.

Current counsel has ... showed me affidavits and records that document Mr. Gorby's childhood, which include physical abuse, sexual molestation, and gross neglect as well as evidence of Mr. Gorby's brain damage. Together, and separately, this material presented a powerful case for mitigation that would have explained Mr. Gorby's actions to the jury. If I had possessed this information, I would have used it at sentencing. I had no strategic or tactical reason for not investigating and presenting this information.

... At some point in preparing for trial, I asked Mr. Gorby's mother about Mr. Gorby and she told me that Mr. Gorby had a rough childhood and that he drank too much. I did not follow up on this nor did I talk to any other family members about Mr. Gorby's background. Nor did I procure records on Mr. Gorby which would have indicated his traumatic childhood. If I had learned of Mr. Gorby's history of childhood abuse, neglect and drug and alcohol abuse, I would have had Mr. Gorby evaluated by a mental health expert who could have explained the mitigating effects of Mr. Gorby's horrific childhood to the jury. I had no strategic or tactical reason for not investigating and presenting this information.

... I presented mitigating evidence that Mr. Gorby was a good worker. However, because I did not have time to prepare, I did not insist that the judge instruct the jury under the (e)(8) "catch-all" mitigating circumstance. I should have requested that the judge instruct the jury under this mitigating circumstance so that the jury could have considered this evidence.

Declaration/Affidavit of Trial Counsel, at ¶¶ 6–8.

At the time initially scheduled for hearing on the petition, the PCRA court credited the Commonwealth's argument that Appellant's claims were not amenable to post-conviction relief, and therefore, declined to proceed with a hearing. Appellant's post-conviction counsel indicated to the court that witnesses were present in the courtroom and specifically objected to the court's decision to dismiss the petition based upon grounds of legal insufficiency. *See* N.T., November 9, 1999, at 23.

Prior to the entry of an order of dismissal, the PCRA court reconsidered its decision to deny an evidentiary hearing in the entirety, and it scheduled a limited hearing, restricted to the presentation of testimony from trial counsel. At the hearing, Appellant's PCRA counsel again noted on the record that he was prepared to call other witnesses, but the court declined to entertain their testimony. *See* N.T., January 19, 2000, at 6–7. Trial counsel's testimony ensued, and consistent with his declaration, he repeatedly testified that he had no strategic or tactical reason for not developing life-history, mental-health and other mitigation evidence. *See, e.g.,* N.T., January 19, 1999, at 22–24, 27, 30, 32, 68, 72, 82, 94–95. The following passages are examples:

Q. Now, we already discussed the fact that you were aware that he had scars on the head from the head injuries, he had been hospitalized because of head injuries, his mother told you he did poorly in school, his mother told you that he did poorly on testing?

A. Correct.

Q. In addition, his mother told you and you knew from Mr. Gorby himself and from the witnesses you interviewed that he had a history of intoxication?

A. I knew Jeff drank a lot, correct.

Q. Did you know that he had a history of drug use?

A. To some extent, yes. Jeff even I think admitted that to me.

Q. You can't miss that in talking to Mr. Gorby?

A. Correct.

Q. Putting the history of intoxication, of alcohol abuse and of drug abuse together with the head injuries and the poor achievement he had in childhood, was there a tactical or strategic reason for not putting all that together and seeking a mental health expert's assistance?

A. No.

\* \* \*

Q. Putting together with the historical information that you had about the head injuries, about his poor achievement, about the low test scores, about his history of drug abuse, about his history of alcohol abuse, putting all of that together, was there a tactical or strategic reason for not providing that to a mental health expert?

A. No, not really.

*Id.* at 68, 72; *accord id.* at 94–95. Counsel also confirmed that, had he known information derived from the life-history declarations proffered with Appellant's PCRA petition, he would have had Appellant examined by a mental-health professional, and that he had no strategic or tactical reason for having failed to do so. *See, e.g., id.* at 55–56. Further, counsel affirmed that Appellant had never indicated that there was any area of mitigation that he did not wish to be explored. *See id.* at 65–66.

Appellant's trial counsel, however, did not affirmatively concede actual ineffectiveness on his part. Rather, he maintained that he simply was not made aware of much of the information contained in the post-conviction proffer, although he had had extended conversations with Appellant and his mother, and, to a lesser degree, Appellant's step-father. Indeed, to some extent, counsel distanced himself from his declaration, indicating that it had to be considered in context, in particular, in light of the limited information with which he had been provided by his primary source, Appellant's mother, whose statements, he believed, had to be taken at face value. The following passage from the post-conviction transcript is illustrative:

Q. If you could turn to entry A–5, that's your affidavit, ..., prior to your testimony here today—of course, after the trial, but prior to your testimony here today, you had the opportunity to review the affidavits from Dr. Fox, Dr. Semone, Dr. Toomer, and Dr. Krop, the doctors who evaluated Mr. Gorby during the post-conviction proceedings?

A. Briefly, yes.

Q. And if I can just sort of in a global way, they contained useful, helpful information?

A. They do as far as what they say in their affidavits. That's correct.

Q. Can you think as you are testifying here today of a tactical reason not to use that type of information?

A. No.

Q. If you could look at paragraph 6 of your affidavit where you indicate that the records, the historical information and the mental health evaluations, together and separately this material presented a powerful case for mitigation that would have explained Mr. Gorby's actions to the jury. If I had possessed this information, I would have used it. I had no strategic or tactical reason for not investigating and presenting this information and the information as discussed earlier in that affidavit in the paragraph, and that's accurate?

A. It is accurate to that extent. I didn't have that information. It wasn't provided to me so that I could obtain it. If I had had that information, I probably would have used it.

Q. Also as you indicated there was not a tactical reason for not using it?

A. Right.

N.T. January 19, 2000, at 81–82; *see also id.* at 38 ("I took what [Appellant's mother] said at face value."), 102 ("I had to rely upon what her information was which she gave me."), 39 ("[M]y point was that, you know, I could only take what I got from people I talked to."). Counsel repeatedly explained that, because information was not provided to him by the family, he could not obtain it.[8] He also indicated, "I felt that I had enough information from [Appellant's mother] and his stepfa-

8. *See, e.g., id.* at 82 ("I didn't have that information. It wasn't provided to me so that I could obtain it. If I had had that information, I probably would have used it."), 96 ("A lot was to be included after discovery evidence—after discovery of medical opinions and reports and documents of that nature which were not provided to me. The information had not been provided to me before trial."), 98 ("Well, like

ther and from [Appellant] to give me some indication of who I was dealing with and who [Appellant] was and how to defend him properly." N.T., January 19, 2000, at 41–42.

At the same time, however, counsel repeatedly deflected questions probing why the information generated from the family did not prompt further inquiry on the basis that the information that he had received was not specific.[9] At one point, he also sought to clarify his references to a "rough" or "difficult" childhood on Appellant's part, indicating that Appellant's mother had merely referred to a "rough and tumble" childhood, or one in which Appellant was merely difficult for his parents to handle, see id. at 63–64, and he asserted that the information obtained from Appellant's mother and step-father was not indicative of childhood issues such as poverty, abuse, and neglect. See, e.g., id. at 44–45.

Counsel's testimony was also equivocal in various responses concerning the extent of his investigation, as reflected, for example, in the following passage:

Q. I think you said [Appellant's mother] did give you names and addresses of some family members?

A. I think she specifically gave me the address of the stepbrother, I knew that he had various siblings and relatives.

I said, the fact that the words are there in the context that they appear would be correct in that those reports, the medical records, et cetera, et cetera, came into after the fact, came after the trial. I didn't have that information at the time of the trial.").

9. See, for example,

Q.... His mother had indicated that [Appellant] had had a difficult life?

A. Well, she mentioned things like that, but she wasn't specific, correct.

*       *       *

Q. And the actual youth records ... include entries indicating very low achievement scores and testing of Mr. Gorby reflective of thinking problems on his part?

A. Yeah, and I think his mom may have alluded to that, but not in any great detail.

N.T., January 19, 1999, at 37, 40–41; see also id. at 58 (indicating that Appellant's mother "didn't go into detail" about Appellant's having been rendered homeless by his step-father).

THE COURT: Did she give you names?

THE WITNESS: I think she did. I just can't remember specifically.

THE COURT: Did you follow up on them?

THE WITNESS: I followed up on it to the extent that I would have asked her what can these people help me with? What can they offer to me? Is there anything I can talk to them about that would be beneficial here, and Betty I think would have paraphrased what she believed they would have been able to offer me.

Q. As you indicated in the affidavits, you did not follow up by speaking to the other specific family members themselves?

A. At that point I did not follow up. I just didn't think I had a reason to at that point.

Q. You didn't actually interview, just to make it clear, the other family members?

A. No, I didn't interview them. I may have talked to one by telephone, but I didn't physically sit down and interview them because I really talked to Betty extensively.

Q. Do you specifically remember who you spoke to, if anyone, on the phone?

A. No.

Q. It could have been someone or not?

A. That's correct, I don't remember who it was.

N.T., January 19, 2000, at 61.[10]

Finally, with regard to the absence of an objection to the trial court's failure to charge on the (e)(8) mitigator, counsel's explanation was as follows:

**10.** Other portions of the transcript amplify that counsel did not follow up with interviews of potential life-history witnesses other than Appellant's mother and step-father. *See, e.g.*, N.T., January 19, 2000, at 37–38 (reflecting counsel's concession that he did not contact Appellant's step-brother); *id.* at 74 (counsel did not contact Ms. Denjen, Appellant's aunt, or her husband); *id.* at 76–77 (counsel did not interview Gloria Wilson or Caroline Everly, Appellant's aunts); *id.* (counsel did not interview Appellant's sister or long-time friend). *See generally id.*

Q. In terms of the Court not giving an instruction, on the (e)(8) mitigating catch-all factor, we will just use that terminology here, you indicated in the affidavit at paragraph 8: "I did not insist that the Judge instruct the jury under the (e)(8) catch-all mitigating circumstance. I should have requested that the Judge instruct under this mitigating circumstance so that the jury could have considered this evidence."

A. I thought—well, yes, that's correct. We discussed it before we went out and my recollection is that that was going to be part of the procedures that either [the district attorney] or I could argue, and that's why I didn't do it.

Q. Was there a tactical reason for not objecting to that for purposes of having the record clear as to your position?

A. No, because I had thought for the record that I had—I had objected to that. If I hadn't, then the record speaks for itself.

Q. Without an instruction the jury to consider categories of evidence, the jury won't consider it.

A. It is logical.

Q. And the actual defense evidence that you put on at the penalty phase was [Appellant's stepfather], was the (e)(8) type evidence?

A. Correct.

N.T., January 19, 1999, at 90–91.

In April 2000, the PCRA court dismissed the claim of ineffective assistance of counsel connected with the failure to investigate and present mitigation based on the conclusion that Appellant's trial counsel had conducted a sufficient investigation but simply had not uncovered the information proffered in the post-conviction declarations. *See Commonwealth v. Gorby*, No. 555(a)(b) 1986, *slip op.* (C.P. Washington April

(explaining, "I just sort of found out from [Appellant's mother] her family situation. I don't remember specifically interviewing these people," and indicating that counsel had no basis for disputing the witnesses' declarations to the effect that they were not contacted).

18, 2000). Initially, the court accepted that counsel's testimony at the PCRA hearing "does not conflict with the testimony proposed in the affidavits provided by [Appellant]. [Counsel] admits that he never inquired into [Appellant's] history of abuse." *Id.* at 4. The court, however, highlighted counsel's testimony that he had lengthy conversations with Appellant's mother and Appellant and had no indication that Petitioner had suffered abuse and/or a mental health defect. In this regard, the court noted counsel's testimony that, in his estimation, Appellant displayed no overt signs of any mental health problem and, indeed, he had participated actively in the defense. With regard to counsel's appreciation that Appellant had suffered a head injury in an automobile crash as a teenager, thus putting counsel on inquiry notice as to potential cognitive disorder arising from brain injury, the court accepted the explanation that Appellant's mother had not given any indication that the incident could have had an impact on his mental health. *See id.* at 6. Further, the court opined that counsel's assumption was correct, in that the medical records offered in support of the PCRA petition "indicate only a broken jaw, contusions to the face, and surgery. They provide no evidence of concussions or brain damage." *See id.* at 7.[11]

The court acknowledged that, if the information furnished with the petition was true and accurate, there was "no doubt ... that it may have been useful to [Appellant's] defense at trial, particularly in the penalty phase." *Id.* at 7. Indeed, the court stated that, "[h]ad trial counsel known of any of alleged mental problems that [Appellant] may have suffered, he would most certainly have a duty to investigate further into the possible mitigating evidence that existed at the time of trial." *Id.* However, the court reasoned:

[I]f trial counsel did not know nor had reason to know of the existence of such evidence then he cannot be deemed to be ineffective. The question then is whether or not trial

11. In this regard, the PCRA court omitted any reference to the "blow-out type fracture of the left orbit," *i.e.*, the cracking of the skull around the left eye, the reported memory loss, or the exhibited drifting and poor responses of the eyes that are reflected in the medical records, as previously noted.

counsel did or did not breach his duty to conduct a reasonable investigation into petitioner[']s childhood history and mental health background at the capital sentencing proceeding or the guilt phase. We conclude that trial counsel did not breach his duty.

As evident from [counsel's] testimony, he had no knowledge of any of the alleged mental health problems of [Appellant] nor did his lengthy conversations with [Appellant's] mother, [Appellant's] stepfather, or [Appellant] himself give any indication that such problems existed. Furthermore, there were no other indications that should have placed trial counsel on alert as to the possibility of the existence of mental health evidence. [Appellant's] medical and hospital records do not include MRIs or other examinations of the brain. [Appellant] himself spoke articulately and intelligently. He has an IQ of 105. Appellant has failed to prove that his trial counsel was ineffective or that his subsequent counsel was ineffective for failing to bring a meritless claim and this claim is dismissed.

*Id.* at 7–8 (citation omitted).

With regard to the claim that trial counsel was ineffective for failing to request an instruction under the Section 9711(e)(8) catch-all mitigator, the PCRA court held that the evidence offered by Appellant at trial "was insufficient as evidence of mitigation" to qualify for treatment under subsection (e)(8). *Id.* at 10–11; *see also id.* at 11 ("The fact that [Appellant] occasionally did things around the house is insufficient evidence of the existence of [Appellant's] record to merit a 'catchall' instruction."). Furthermore, the court found any ineffectiveness associated with the absence of the catchall charge to have been harmless, as the jurors had received a general instruction to consider all evidence. *See id.* at 12.

On appeal, among its arguments the Commonwealth complained that it was disadvantaged by the absence of a full evidentiary record, in terms of its ability to respond to Appellant's claim of ineffective assistance of counsel for failure to investigate Appellant's mental health history. *See Commonwealth v. Gorby,* 567 Pa. 370, 378, 787 A.2d 367, 372 (2001)

(plurality). Although a majority of the Court joined in the denial of guilt-phase relief, a distinct majority implemented a limited remand for factual development of the ineffectiveness claim centered on the absence of mental-health mitigation. *See id.* at 379, 787 A.2d at 372; *id.* (Cappy, J., concurring); *id.* (Saylor, J., concurring); *id.* (reflecting concurrences in the result by Justices Zappala, Nigro, and Newman). Mr. Justice Castille filed a responsive opinion in which he concurred in the denial of guilt phase relief, but dissented with regard to the remand, as he would have also affirmed the denial of penalty-phase relief on the basis that the claims of ineffective assistance on the part of Appellant's trial counsel were meritless and waived, and claims of deficient stewardship of appellate counsel also failed on their merits, based upon insufficient development. *See id.* at 380–83, 787 A.2d at 374–75.[12] The Commonwealth moved for reconsideration, which was denied.

On remand, the PCRA court limited the presentation to mental-health evidence in accordance with this Court's Order, while Appellant again sought, but was not permitted, to develop a record concerning the broader social-history aspect. *See* N.T., April 2–3, 2002, at 13–14. Testimony was adduced from two psychologists, Harry D. Krop and Jethro W. Toomer, and a psychiatrist, Dr. Robert C. Fox, Jr. These mental health professionals confirmed that, after examinations and testing of Appellant and upon review of his medical and social-history records, they had determined that he suffers (and suffered at the time of the killing) from cognitive disorder, other major mental health conditions, and the effects of substantial and prolonged childhood abuse, impacting on his thinking and conduct, and implicating the mitigating circumstances under Section 9711(e)(2) (influence of extreme mental or emotional

12. This opinion preceded the Court's acknowledgement in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), that the Court's requirements pertaining to development of a claim of ineffective stewardship on the part of appellate counsel were not clear, and the associated holding that an appropriate response to an undeveloped claim in cases preceding *McGill* was a remand to provide an opportunity for adequate development under clarified standards. *See id.* at 590–91, 832 A.2d at 1024.

disturbance), (e)(3) (substantial impairment of capacity to appreciate criminality of conduct or conform conduct to requirements of law), and (e)(8) of the death penalty statute, 42 Pa.C.S. § 9711(e)(2), (e)(3), (e)(8). Although the expert witnesses generally testified that the etiology of the asserted cognitive disorder was difficult to determine, they emphasized that there were "red flags" present in Appellant's medical and social history, including his irrational behavior at the time of the offense, *see* N.T., April 2–3, 2002, at 75–76, 147–48, 192–93; head injury involving a fracturing of the portion of the skull adjacent to the left frontal lobe of the brain, *see id.* at 41, 199–200; [13] maltreatment during his childhood as evidenced by the life-history declarations and medical records indicating, *inter alia*, malnutrition, dehydration, and abandonment; incidence of high fever, *see id.* at 138; alcoholism and poly-substance abuse, *see id.* at 45, 70–71; dysfunctional and abusive family situation, *see id.* at 50–57, 61; relatively high intelligence as distinguished from poor educational performance, *see id.* at 138; and consistently poor decision making. *See id.* at 70–71.

The professionals also testified that it is not unusual for people with mental-health issues to lack self-recognition, *see* N.T., April 2–3, 2002, at 47, nor is it unusual for persons involved in abusive family situations to demonstrate reluctance to discuss the abuse—in these regards and others, they emphasized the essential role of collateral data in the form of medical, mental-health, and social-history records in making an informed assessment concerning an individual's mental-health makeup. *See, e.g., id.,* at 48 (describing collateral records as "significant and critical and essential in terms of the evaluation process"); *see also id.* at 28–29, 48, 70, 115, 125–26, 133–35. According to the expert witnesses, the life-history records that were assembled at the post-conviction stage closely correlated with the results of neuropsychological testing and evaluations. Further, the witnesses specifically

13. In this regard, it was explained that the left frontal lobe, which impacts upon cognitive function and, in particular, impulse control, resides behind the left eye, and in a substantial impact may be damaged when it collides with the skull. *See* N.T., April 2–3, 2002, at 43–44, 199–200, 205–06.

testified that the facts that were known to trial counsel, even when considered in the generalized manner in which he discussed them, presented "clear indicia of serious emotional problems." *See id.* at 67–68, 76, 131–33 (characterizing the information known to counsel as containing "significant cues that further investigation appeared to be warranted" and "red flags"), 184–87, 225–26.

The Commonwealth presented no affirmative evidence in rebuttal. On cross-examination, however, the district attorney: pointed to the context of the examinations and testing in terms of their being undertaken by witnesses engaged by the defense thirteen years after Appellant's crimes; highlighted the inability of the experts to confirm the actual etiology of the asserted cognitive disorder and, thus, its time of onset; developed the possibility of explanations for discrete instances from Appellant's history, such as his erratic attendance at and poor performance in school, other than cognitive disorder or impact from abuse; observed that Appellant had functioned adequately in the military and in prison; noted the absence of any self-report by Appellant of mental health problems or history of mental health diagnosis; emphasized Appellant's normal intelligence; suggested the possibility of malingering; and questioned the professionals extensively on their ultimate conclusions. *See* N.T., April 2–3, 2002, at 84–101, 156–70, 238–80.

Following the hearing, the PCRA court issued a supplemental opinion confirming that the presentation of evidence changed neither its position nor its analysis. In this regard, the court reiterated its view that "counsel's consultations with [Appellant] and his family triggered no basis for him to pursue a mental health issues mitigation as at [sic] the penalty phase." *Commonwealth v. Gorby*, No. 555(a)(b) 1986, *slip op.* at 4 (C.P. Washington May 23, 2002). The court stated that "even accepting as true the testimonies of the three expert witnesses, ... in 1985 and 1986 during [trial counsel's] representation of [Appellant], based upon the reasonableness of the circumstances known to trial counsel, he was not ineffective to have failed to investigate [Appellant's] mental health history

and capacity of the penalty phase of the trial [sic]." *Id.* at 5–6. The court concluded:

This PCRA court notes that presently, most if not all trial counsel, if given the financial ability to do so, would investigate a defendant's mental health history from date of birth to the present in a capital case, even absent triggering information or evidence if for no other reason than to defend against a future claim of alleged ineffectiveness of counsel. But we have not reached the point yet where the appellate courts have ruled that in all capital cases, regardless of the circumstances, a thorough investigation regarding defendant's mental health history must be made and presented during the penalty phase in order for the trial defense attorney to meet successfully future challenges regarding ineffectiveness of trial counsel.

*Id.* at 6.

While the matter was pending in this Court after the initial remand, the Court issued *McGill,* 574 Pa. at 574, 832 A.2d at 1014, which confirmed the waiver of claims of ineffective assistance of trial counsel not raised in direct appeals that were concluded prior to the issuance of the Court's decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), and clarified the requirements for pleading, presentation, and proof relative to the only potentially extant, derivative claim in such cases, namely, a challenge to the stewardship of counsel on direct appeal for failing to raise the issue of trial counsel's ineffectiveness. *See McGill,* 574 Pa. at 587–89, 832 A.2d at 1022–23. Pursuant to the protocol delineated in *McGill,* this Court entered an Order remanding the matter to the trial court to permit appropriate development. Appellant moved for reconsideration, arguing that relief was due in the absence of any further hearing, which was denied.

At the hearing on remand, Appellant was unable to question his counsel from the direct appeal, since that attorney had died during the course of the litigation. Appellant, however, presented testimony from two lawyers with substantial defense experience in capital litigation, who opined that Appellant's claim of ineffective assistance of trial counsel at the

penalty phase of trial was strong and apparent from the record. *See, e.g.,* N.T., October 15, 2004, at 91–92. In this regard, the attorney-witnesses discussed trial counsel's apparent confusion concerning mitigation as manifested on the trial record, *see, e.g., id.* at 27–28, trial counsel's failure to object to the absence of an instruction under the catch-all mitigator, *see, e.g., id.* at 29, and the paucity of weight of the evidence going to the mitigator that actually was requested, *see, e.g., id.* at 61. Both also testified that, based on circumstances actually known to trial counsel, additional investigation into Appellant's mental health condition was clearly warranted. *See* N.T., October 15, 2004, at 24, 37–38, 87–88. The witnesses also offered an assessment of the strength of the issues that were actually raised by Appellant's counsel in the direct appeal, as compared to the claim that counsel was ineffective in failing to investigate and present available mitigation evidence, finding the former quite weak and the latter very strong. *See, e.g., id.* at 90–91. Further, both attorney-witnesses indicated that they considered counsel's conduct in failing to collect medical and social-history records to be highly irregular. *See, e.g., id.* at 38 ("That is the whole crux of the penalty investigation. That's where you begin, with the records."). Both also affirmed that the information found in the records collected on post-conviction review should have generated additional inquiry, including evaluation by a mental-health professional. *See, e.g., id.* at 57–58, 76. The Commonwealth presented no evidence in rebuttal, but rather, relied upon cross-examination similar to that of the mental-health witnesses during the previous remand. The PCRA court did not issue a subsequent opinion, since one was not required under the remand Order.

■ Presently, in supplemental briefing, Appellant frames his arguments as directed in *McGill*, contending that the record as described above amply establishes deficient stewardship on the parts of his counsel at trial and in the direct appeal, in terms of the relevant criteria of arguable merit, reasonable strategy, and prejudice. *See Commonwealth v. Pierce*, 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987).

Appellant views his situation as a case in which very little mitigation was actually presented to the jury; a tremendous amount of valid mitigating evidence was ignored by trial counsel, who was aware of important facts that should have given rise to further investigation and consequent development of such mitigation; trial counsel repeatedly testified he had no strategic reason for ignoring the evidence and not pursuing the essential investigation; the original penalty phase transcript alone shows that trial counsel was confused and unprepared; there was no legitimate reason, designed to effectuate Appellant's interests, for appellate counsel not to present the ineffectiveness claim; appellate counsel presented comparatively weak and "essentially frivolous" claims; and there is a reasonable probability that, had appellate counsel presented the penalty-phase ineffectiveness claim, relief in the form of a new sentencing hearing would have been granted. Appellant draws support from the United States Supreme Court's decisions in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), citing these decisions, *inter alia,* for the general proposition that capital counsel have the "obligation to conduct a thorough investigation" for possible mitigating evidence, *Williams,* 529 U.S. at 396, 120 S.Ct. at 1514–15 (citing ABA STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980)), and the more specific understanding that counsel simply cannot meet this requirement by relying upon only "rudimentary knowledge of [a capital defendant's] history [acquired] from a narrow set of sources," *Wiggins,* 539 U.S. at 524, 123 S.Ct. at 2537. It is Appellant's position that the PCRA court held precisely to the contrary by accepting counsel's approach of limiting his investigation to conversations with Appellant, his mother, and his step-father, while omitting further investigation of other known and readily available life-history witnesses, and never obtaining a single document pertaining to his client's life history. Appellant also highlights the PCRA court's affirmative finding that trial counsel "never inquired into [Appellant's] history of abuse," as well as its finding of consistency between counsel's post-conviction testimony and the mitigation-witness declarations

indicating that counsel never asked about Appellant's background or past. In this regard, Appellant emphasizes that it is counsel's duty—not that of the defendant or his family—to know what types of information may be mitigating, and to thoroughly seek out and develop such information. *Accord Wiggins,* 539 U.S. at 525–26, 123 S.Ct. at 2537–38 (framing the relevant inquiry in terms of counsel's duties, and not obligations on the part of the capital defendant himself or the witnesses); *cf. Commonwealth v. Malloy,* 579 Pa. 425, 459, 856 A.2d 767, 788 (2004) ("The onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discover such evidence through his own efforts, including pointed questioning of his client."); *Commonwealth v. Basemore,* 560 Pa. 258, 290, 744 A.2d 717, 735 (2000) ("Obviously ... different light falls upon counsel's performance depending upon whether he asked and was not told, or he did not ask and therefore was not told." (citing *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984))).

The Commonwealth filed a brief following the first remand entailing the presentation of the mental-health mitigation evidence, but it did not file a supplemental brief following the *McGill* remand. In the brief that it filed, the Commonwealth argues, as the PCRA court found, that the testimony of the mental-health experts should not alter the conclusion that trial counsel was effective in the discovery and presentation of mitigating evidence. The Commonwealth again highlights: the lapse of time between the examinations and testing and the time of Appellant's offenses; that fact that Appellant's intelligence is in the normal range; Appellant's adequate military service; Appellant's self-reporting of no mental-health disorder; the inability of Appellant's experts to pinpoint an etiology for the asserted cognitive disorder; and an acknowledgement by one of the professionals that Appellant knew that the killing of the victim was a crime. Further, the Commonwealth argues:

> [Appellant's] child and adult record is devoid of any psychological report that [Appellant] was suffering from any men-

tal illness prior to the commission of the homicide. Mental illness/brain damage was not suspected or found to exist prior to the deficiencies found by Dr. Krop on three test batteries some 13 years after [Appellant] was placed on death Row. Trial Counsel was not informed of any mental illness and testified that [Appellant] was articulate when he testified during trial. There is nothing apparent from the record which would have placed any trial counsel on notice of any claim of mental illness.

\* \* \*

The Commonwealth is in agreement with the findings of the PCRA Court and its opinion and commentary. The Commonwealth also notes that there is no life history of bizarre behavior on the part of [Appellant]. Likewise there is no apparent nexus between the violent stabbing death of Drayton Spahr and [Appellant's] deficient performance on a categories and card sorting test administered thirteen years after an event. Neither a ten year old broken jaw or a twenty three year old high fever provided trial counsel with any real notice or opportunity to seek mitigation of his crime.

Brief for Appellee, at 5–6.

Under the Post Conviction Relief Act, constitutionally ineffective assistance of counsel will support a claim for postconviction relief. *See* 42 Pa.C.S. § 9543(a)(2)(ii); *see also Commonwealth v. Chester,* 557 Pa. 358, 374–76, 733 A.2d 1242, 1250–51 (1999) (holding that the Post Conviction Relief Act extends to challenges arising from the penalty phase of trial, including ineffectiveness claims). As noted, Appellant's only extant claim is of ineffective assistance of his counsel on direct appeal. However, such challenge derives from Appellant's waived claim of ineffective assistance of trial counsel, and the underlying claim is appropriately considered as a component of the essential analysis. *See McGill,* 574 Pa. at 587–88, 832 A.2d at 1022–23.

■ Considering the prevailing review standards, the factual and procedural background, the record, the PCRA court's opinions, and the parties' arguments, we find it reasonably clear that Appellant's trial counsel provided constitutionally deficient stewardship. In the first instance, Appellant correctly invokes United States Supreme Court authority for the proposition that capital counsel have an obligation to pursue all reasonably available avenues of developing mitigation evidence. *See, e.g., Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535; *see also Williams,* 529 U.S. at 396, 120 S.Ct. at 1515 (explaining that capital counsel has a duty to thoroughly investigate a client's background). Further, we agree with Appellant that the record amply demonstrates both that trial counsel inappropriately limited his investigation to the acquisition of rudimentary information from a narrow set of sources, and that the information that counsel did acquire through his limited efforts should have prompted additional investigation in any event, which should have yielded additional mitigation. The record reflects no reasonable strategy supporting counsel's approach of curtailing his penalty-phase investigation in such fashion. Indeed, the PCRA court was able facially to support a conclusion that counsel was effective on this record only by characterizing the case in fairly abstract terms—for example, by focusing on the testimony that counsel questioned Appellant's mother "a lot," *Gorby,* No. 555(a)(b) 1986, *slip op.* at 4, as opposed to taking into account the content of the conversations, including the specific information that was actually known by and/or furnished to counsel and the omission of any inquiry into potential mitigation avenues such as childhood abuse.[14] Furthermore, the PCRA court's approach to the issue of trial counsel's ineffectiveness is untenable, as it rests solely upon a finding that counsel's truncated investigation was a sufficient one, at the same time as it expressly accepts

14. As noted, the PCRA court specifically found that trial counsel's post-conviction testimony "does not conflict with the testimony proposed in the affidavits provided by [Appellant]. [Counsel] admits that he never inquired into [Appellant's] history of abuse," *See Gorby,* No. 555(a)(b), *slip op.* at 4; it failed, however, to accord such finding any meaningful role in its actual decision making.

that well-traveled avenues of mitigation were not pursued during the course of the limited inquiry that was made.

The PCRA court also incorrectly credited counsel's reliance on witness conclusions as to critical matters (such as an indication from Appellant's mother that he suffered no mental infirmity), to foreclose additional inquiry, despite counsel's actual knowledge of circumstances that should have prompted at least some further investigation (for example, Appellant's irrational behavior after his crimes; his "rough childhood"; his dependency on intoxicating substances; his poor educational achievement and test results despite normal intelligence; and the known incidence of head injury). One of Appellant's attorney witnesses likened such a course of conduct to a physician who, on considering a description of symptoms by a patient suffering from a disease, offers the patient a clean bill of health without examination or testing, because the patient did not specify a diagnosis. *See* N.T., October 15, 2004, at 45. While such analogy is not a perfect one, it does cast some illumination on this substantial weakness in the PCRA court's reasoning.

It is also reasonably clear that the necessary but omitted investigation would have yielded evidence of value at the penalty phase of Appellant's trial, as the PCRA court repeatedly recognized. Furthermore, and particularly as trial counsel's actual presentation at the penalty phase of trial was remarkably weak,[15] we find it reasonably probable that at least one juror might have decided differently had an effective presentation been made, and thus, might have averted a death sentence. *See* 42 Pa.C.S. § 9711(c)(1)(iv). Accordingly, we conclude that the arguable merit prong of inquiry into the effective assistance of appellate counsel is established. *See generally McGill*, 574 Pa. at 587–88, 832 A.2d at 1022–23 (explaining the interrelationship between the three-prong ineffectiveness inquiry relative to a waived claim of ineffective

15. In this regard, the PCRA court did not reconcile its reliance on the frailty of the defense penalty-phase presentation to explain the absence of an instruction regarding the catch-all mitigator with its broader conclusion that trial counsel's performance was constitutionally adequate.

assistance of trial counsel and the arguable-merit aspect of a layered claim of deficient stewardship on the part of appellate counsel).

The record also supports no reasonable strategy on the part of appellate counsel in failing to present a claim of ineffective assistance of trial counsel. Such a claim merited exploration based on the apparent weakness of trial counsel's penalty-phase presentation alone, as reflected on the face of the trial record; further, a reasonable inquiry should have yielded the information that was developed on post-conviction review concerning the unduly limited scope of trial counsel's penalty-phase investigation. We also agree with Appellant that the ineffectiveness claim was substantially stronger than the claims that were raised on direct appeal.[16] Finally, we find the prejudice criterion of the ineffectiveness inquiry satisfied, since had appellate counsel raised the issue in appropriate terms, relief in the form of a new sentencing proceeding should have been afforded at the direct-appeal stage, based on the same set of circumstances that require such an award at this juncture.

In short, we believe that the salient claim of ineffective assistance of trial counsel was unreasonably omitted from the direct appeal, again, resulting in prejudice.

Finally, we differ with the PCRA court's suggestion that the grant of post-conviction relief in this case would indicate that in all capital cases, regardless of the circumstances, mental-health mitigation must be presented to the jury for a defense attorney to meet future challenges to his stewardship. In fact, it is the sum total of the individualized circumstances as

16. For example, counsel on direct appeal pursued a claim of evidentiary insufficiency in a case in which the evidence "was overwhelming to support [A]ppellant's conviction for first degree murder," *Gorby*, 527 Pa. at 107, 588 A.2d at 906, a claim that testimony of Appellant's asserted common law wife was improperly admitted over an assertion of marital privilege which had "no legal basis" because Appellant remained legally married to another, *id.* at 110, 588 A.2d at 907–08, and a claim of error in failure to sequester jurors that contained "no claim of actual prejudice" and was accordingly denied in a relatively summary fashion, *see id.* at 110–11, 588 A.2d at 908.

developed on the post-conviction record (and above) that require relief in this case, as such totality reflects evident failures on the part of Appellant's trial counsel to afford constitutionally effective representation at the penalty phase of trial and of his appellate counsel to vindicate the resultant claim for relief from the sentence of death.

The order of the PCRA court is reversed, and post-conviction relief is awarded in the form of a new penalty hearing. Jurisdiction is relinquished.

Chief Justice CAPPY, and Justice NEWMAN, Justice BAER and Justice BALDWIN join this opinion.

Chief Justice CAPPY also files a concurring opinion in which Justice NEWMAN joins.

Justice CASTILLE files a dissenting opinion in which Justice EAKIN joins.

Chief Justice CAPPY, *concurring*.

I join the majority opinion. Furthermore, I agree with the rule of law the majority sets forth for reviewing capital counsel's conduct when a petitioner raises a claim of ineffectiveness based on counsel's failure to investigate and/or present mental health or social history mitigating evidence, namely, that "capital counsel have an obligation to pursue all **reasonably available** avenues of developing mitigation evidence." Majority opinion at 790 (emphasis added).

I write separately only to clarify what I believe the proper appellate court standard of review should be in cases involving a claim of ineffectiveness based on counsel's failure to pursue all reasonably available avenues of developing mitigating evidence.

When reviewing such a claim, we repeatedly iterate the general ineffectiveness standard of review, which involves:
a review of the PCRA court's findings to see if they are supported by the record and free from legal error. *Commonwealth v. Reyes*, 582 Pa. 317, 870 A.2d 888, 893 n. 2 (2005). Our scope of review is limited to the findings of the

PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party.

*Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 583 n. 25 (2005). In this context, this generic standard is largely unhelpful as it fails to define an appellate court's role in deciding distinct issues with any precision. Furthermore, I do not believe our scope of review should be limited in these cases.

In *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court announced that ineffectiveness "is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to deference ... and although district court findings are subject to the clearly erroneous standard ..., both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." While making clear that ineffectiveness questions are "mixed," this announcement in no way clarifies the appropriate standard of review. Indeed, other state courts have been struggling with this very question and reaching different results. *See, e.g., Coleman v. State,* 741 N.E.2d 697, 699–700 (Ind.2000) (supporting a deferential standard of review: "We will reverse a negative judgment after a non-jury trial only if 'the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court.' "); *State v. Gill,* 967 S.W.2d 540, 542 (Tex.App.1998) (noting that court reviews *Strickland* standards "through the prism of an abuse of discretion standard"); *but see State v. Rice,* 261 Kan. 567, 932 P.2d 981, 1005 (1997) (holding that the appellate standard of review of ineffectiveness claim is *de novo* ).

When reviewing mixed questions of fact and law, the inquiry is what level of deference should be given to the determinations by the lower tribunal. And, in Pennsylvania, there is no set appellate court standard of review for mixed questions. *Warehime v. Warehime,* 563 Pa. 400, 761 A.2d 1138, 1146 n. 4 (2000) (Saylor, J. concurring) (noting that "this Court has not

articulated a universal standard of review applicable to mixed questions of law and fact").

In considering the answer to this question, at least one commentator has suggested that the standard of review for these types of questions is ultimately a policy choice by the appellate court based on the judicial actor better positioned to decide a particular issue. Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. OF APP. PRAC. AND PROCESS 109, 130 (Spring 2005). In adopting one standard over another, courts have considered the need to unify precedent, reach consistent results, the right to a jury of one's peers, and the desire to see that justice is meted out even-handedly. *See passim.*

The concerns for consistency and ensuring that justice is even-handed are especially compelling when reviewing these unique types of ineffectiveness claims. Not only is the ultimate penalty severe, but we are also confronted with guaranteeing that the constitutional right to counsel is protected. Accordingly, I would make clear that ineffectiveness questions based on counsel's failure to pursue all reasonably available avenues of developing mitigating evidence constitute a mixed question of law and fact. We will draw our own legal conclusions as to whether counsel's conduct fell below constitutionally required standards. Thus, our standard of review is *de novo* in that we owe no deference to the legal conclusion reached by the PCRA court; and our scope of review is plenary. This is no way alters the principle that "the trial court is in the best position to review claims related to trial counsel's error in the first instance as that is the court that observed firsthand counsel's allegedly deficient performance." *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 737 (2002). Indeed, I would continue to accept the factual findings and credibility determinations of the PCRA court that are supported by the record.

Applying this standard to the instant case, I agree with the result of the majority opinion.

Justice NEWMAN joins this concurring opinion.

Justice CASTILLE, *dissenting.*

I respectfully dissent.

The Majority reverses the determination of the PCRA[1] court and awards appellant penalty phase relief from a sentence of death, finding that counsel on appellant's direct appeal was ineffective (as a matter of law) in 1990 for failing to argue that appellant's trial counsel was ineffective (also as a matter of law) in 1985 for failing to investigate and present mitigation evidence. In 2001, when this Court remanded the matter to permit appellant an additional opportunity to develop his underlying claim concerning trial counsel's alleged failure to investigate appellant's "mental history and capacity," I dissented. *See Commonwealth v. Gorby,* 567 Pa. 370, 787 A.2d 367, 372–76 (2001) (Castille, J., concurring and dissenting). I noted that the claim of trial counsel ineffectiveness was waived under the PCRA because appellant had failed to raise it on direct appeal. Second, and directly applicable to the layered ineffectiveness claim upon which today's Majority grants a new penalty hearing, I observed that the PCRA court had passed upon the merits of that claim and had properly rejected it. I noted the following:

> The PCRA court concluded that the claim lacked merit because trial counsel's PCRA testimony revealed that counsel's consultations with appellant and his family revealed no basis for him to pursue a mental health-based defense at the penalty phase; accordingly, appellant "has failed to prove that his trial counsel was ineffective or that his subsequent counsel was ineffective for failing to bring a meritless claim" on direct appeal. PCRA [Court] op. at 8. In disposing of the layered claim, the PCRA court apparently accepted appellant's affidavits [, concerning his mental state and history which were attached to his brief,] at face value, noting that trial counsel's testimony [at the initial PCRA hearing] "does not conflict with the testimony as proposed in the affidavits." *Id.* at 4. Given this posture of the case, a further hearing would be required only if this Court con-

---

1. Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*

cluded that the PCRA court erred in finding that counsel were not ineffective for failing to pursue a childhood trauma/mental health mitigation claim, the basis for which was never revealed to counsel by appellant or his family members. Because I cannot agree with the Court's unexplained and apparently arbitrary grant of a remand here, I respectfully dissent.

*Id.* at 380, 787 A.2d 367. I went on to note that the Court never explained what deficiency, if any, there was in the PCRA court's existing analysis. *Id.* at 384, 787 A.2d 367.

The PCRA court's resolution in 2000 was in accord with what, at least until very recently, had seemed to be settled authority from this Court concerning the obligations of capital counsel at trial. *See Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 586–92 (2005) (Castille, J., joined by Eakin, J., concurring and dissenting) (collecting cases); *Commonwealth v. Zook,* 585 Pa. 11, 887 A.2d 1218 (2005); *Commonwealth v. Hall,* 582 Pa. 526, 872 A.2d 1177 (2005); *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139 (2005); *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004); *Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52 (2003); *Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33 (2002); *Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563 (2002); *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592 (2000); *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717 (2000); *Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435 (1999); *Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233 (1998). The law apparently is changing in this area, and what used to be viewed as reasonable attorney performance at trial is now labeled, in hindsight, unreasonable as a matter of law. I continue to find it difficult to blame counsel retroactively for failing to predict new obligations and refinements in obligations imposed by courts literally decades after counsel's conduct occurred. Consistent with my position in 2001, I continue to believe that this underlying claim of trial counsel ineffectiveness is meritless.

Even if I could agree that trial counsel's performance was deficient, I could not join the Majority's summary finding that

appellate counsel's performance was incompetent as a matter of law. Majority op. at 791–92 & n. 16. The Majority largely engages in a bootstrapping analysis; *i.e.*, because the Majority believes that trial counsel appears to have been ineffective in hindsight, appellate counsel must have been incompetent for failing to raise that claim on direct appeal. In so easily labeling appellate counsel incompetent, the Majority cannot consider the actual investigation counsel conducted because counsel died in the years before appellant filed his PCRA petition. I have written at some length in the past concerning what I believe is required under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) to prove appellate counsel ineffective, and I need not repeat that summary here. *See Commonwealth v. May,* 587 Pa. 184, 898 A.2d 559, 577–79 (2006) (Castille, J., joined by Cappy, C.J., and Eakin, J., concurring); *Commonwealth v. Jones,* 572 Pa. 343, 815 A.2d 598, 613, 614 (2002) (Opinion Announcing Judgment of Court by Castille, J.). It is enough to note that appellant bore the burden of proof; that counsel's demise does not discharge appellant's burden to prove that counsel could not have had a reasonable basis for his strategic decisions on appeal; and that we do not know on this record what sort of investigation was actually undertaken by appellate counsel, what sort of appellate strategy he adopted, and what sort of cooperation he received from appellant and his family. *Contrast May, supra.*

Moreover, to prove counsel incompetent, in 1990, for failing to raise this sort of ineffectiveness claim, one must consult the **then-existing** legal landscape. *See Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 818 (2004) (Castille, J., joined by Eakin, J., concurring and dissenting) ("The requirement that counsel's conduct be viewed in light of contemporaneously-governing law is central to any rational assessment of a claim of ineffectiveness."). The fact that later decisions of this Court and the U.S. Supreme Court have faulted the penalty phase investigations of certain trial lawyers, under certain facts, does not necessarily prove that all reasonable appellate lawyers were required to raise such claims in 1989–

90, which is when appellant's direct appeal was briefed and argued by counsel. In my view, appellant has not discharged his affirmative burden of rebutting the presumption that appellate counsel's performance nearly two decades ago was reasonable under the law prevailing at the time.

Finally, I write to address the fact, noted and summarized by the Majority, but wisely not relied upon in its legal analysis, that appellant attempted to discharge his burden of proving appellate counsel ineffective by presenting the opinion testimony of two criminal defense lawyers who, not surprisingly, each felt that appellate counsel—who was not alive to rebut the opinions—was incompetent. *See* Majority op. at 787–88. I fail to see any relevance in this sort of testimony whatsoever. Certainly, lawyers learned in the law, and experienced in criminal defense appeals, have a reasonable pretension to specialized knowledge in this area and, if the question were one for a jury, their opinions may be relevant. But such opinions are not relevant to the ultimate *Strickland* question courts must decide upon collateral attack. The question of constitutional effectiveness is decided only by jurists, and a judge is hardly in need of the "expert" testimonial views of lawyers in order to make that determination. Courts are at least equally suited to assess attorney performance; indeed, given the obvious potential for bias on the part of lawyers caught in an adversarial system, courts are better situated. If the approach were otherwise, all PCRA hearings would be reduced to contrasting "expert" opinions from lawyers presented by the defense (and countered by the opinions of prosecution "experts") as to just who was ineffective (and who wasn't) in the conduct of a trial. Also, if the approach were otherwise, this Court and the Superior Court could be inundated with the "expert" views of lawyer amici telling us how we should decide *Strickland* questions. The role of lawyers on the question of ineffectiveness is as advocates, not as experts; anything an "expert" would say from the stand, the defendant's lawyer can simply argue from the bar or, more properly, argue in the brief. Thus I, for one, do not view the opinion testimony of lawyers as relevant proof of the effective-

ness, or lack of effectiveness, of the defendant's prior counsel. *See Commonwealth v. Neal,* 421 Pa.Super. 478, 618 A.2d 438 (1992) (error to admit attorney-expert testimony on issue of trial counsel's ineffectiveness).[2]

Justice EAKIN joins this opinion.

**2.** On the separate question of the appellate standard of review, I agree with the Chief Justice that, evidentiary and credibility questions aside, no particular deference is due to a PCRA judge's determination of the *Strickland* question. Indeed, this precept was a prime basis for my penalty-phase dissent in *Collins. See* 888 A.2d at 590 (Castille, J., joined by Eakin, J., concurring and dissenting) ("Although this Court must defer to the credibility findings of the PCRA court in cases where contested material facts are at issue, the determination of the reasonableness of counsel's conduct under the Sixth Amendment—the performance prong of *Strickland*—is not one warranting any particular deference to the PCRA hearing judge, particularly where, as here, that judge is not the same judge who presided at trial.").