913 A.2d 178

**In the Matter of CONDEMNATION BY URBAN REDEVELOP-MENT AUTHORITY OF PITTSBURGH of Certain Land in the 22nd Ward of the City of Pittsburgh, Allegheny County, Pennsylvania, Redevelopment Area 51 (Federal North) Being Property of New Garden Realty Corporation, a Pennsylvania Corporation; Its Administrators, Executors, Successors, Assigns or Any Other Persons Found to Have Any Interest in the Property.**

**Appeal of New Garden Realty Corporation.[1]**

Supreme Court of Pennsylvania.

Argued Sept. 22, 2004.

Decided Dec. 27, 2006.

number of comments, without engaging in a totality of the circumstances analysis, it erred.

1. We note that in its Petition for Allowance of Appeal ("PAA") to this court, New Garden Realty Corporation indicated that both it and New

432

Garden Theatre, Inc. were petitioners. After the grant of allocatur in this matter, the caption read that this was an appeal of "New Garden Realty Corporation and New Garden Theatre, Inc." Such a caption is incorrect. New Garden Realty Corporation and New Garden Theatre, Inc. filed separate preliminary objections before the trial court. While both parties pursued appeals before the Commonwealth Court, no issue was raised before this court via a PAA with regard to New Garden Theatre's preliminary objections. Accordingly, as New Garden Theatre has no issues before this court, it is not a party to this appeal and it will not be included on the caption as an appellant.

434

---

Peter N. Georgiades, Esq., Greystone Legal Associates, P.C., James C. Sargent, Jr., Esq., Lamb McErlane, P.C., Pittsburgh, for New Garden Realty Corp. and New Garden Theatre, Inc.

Witold J. Walczak, Esq., Donald C. Le Gower, Esq., Dechert, L.L.P., Philadelphia, for The American Civil Liberties Union.

Joel P. Aaronson, Esq., Pittsburgh, for Pittsburgh Redevelopment Authority.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.[2]

The issue presented in this matter is whether the Pittsburgh Urban Redevelopment Authority ("the URA") violated the free expression guarantees of the United States or Pennsylvania Constitutions when, as a part of a comprehensive redevelopment plan involving dozens of properties, it exercised eminent domain to take a theater showing adult-content movies. For the reasons that follow, we conclude that the URA's action did not run afoul of either free expression clauses and thus affirm the order of the Commonwealth Court.

The property at issue in this litigation ("the Property") is located at 12 West North Avenue in the City of Pittsburgh in the Federal North area of Pittsburgh ("the Federal North area"). The Property is owned by the New Garden Realty Corporation ("Appellant"). The New Garden Theatre, Inc. ("Garden Theatre"), which is the tenant of Appellant, operates an adult-content movie theater on the Property.[3]

In January of 1989, the Pittsburgh Department of City Planning issued a Basic Conditions Report ("Report")[4] recommending certification of the Federal North area as "blighted" and thus eligible for redevelopment per the Urban Redevelopment Law, 35 P.S. §§ 1701–1719.2. The Report noted that the Federal North area was decaying: its business community was dying; the crime rate was rising; and population was declining. The Report stated negative aspects of the Federal North area included, *inter alia*, problem bars and an adult-content movie theater (i.e., the Garden Theatre).

2. This matter was reassigned to this author.

3. While Appellant and the Garden Theatre are separate entities, they are both 100 percent owned by the same individual.

4. This Court has explained that a Basic Conditions Report contains three components: (1) a description of the overall basic conditions of the area as they fit within general guidelines; (2) a description of the area and the stated conditions analyzed "in relation to the seven conditions of blight as defined in the redevelopment law"; and (3) a recommendation based on the overall condition of the area in light of the redevelopment law. *In re Condemnation of Certain Being Prop. of E–V Co.*, 527 Pa. 550, 594 A.2d 1375, 1377 n. 1 (1991).

A hearing was held before the City Planning Commission ("Commission"). Subsequently, in February of 1989, the Commission unanimously voted to certify the Federal North area ("the Redevelopment Area") as blighted. The Commission then convened the Federal North Task Force ("Task Force"). The Task Force included representatives from the community, the URA, and the Pittsburgh Department of City Planning. Over six years, the Task Force worked to create a redevelopment plan for the area. In 1992, the Task Force presented a Redevelopment Area Plan ("the Redevelopment Plan") and a supporting "Redevelopment Proposal for the Federal North Redevelopment Area" ("the Redevelopment Proposal"). The Redevelopment Plan and the Redevelopment Proposal recommended, *inter alia*, that the URA acquire all property located within three contiguous blocks. Multiple uses were proposed for the redevelopment of these three blocks. An office/research facility as well as a parking garage were to be constructed. On one block, all eleven existing buildings were to be reused and converted into performing arts, cultural and community activities venues as well as commercial space; the Property is located on this block.

Subsequently, the Pittsburgh City Council approved the Redevelopment Proposal. The URA then began acquiring the forty-seven properties encompassed within the redevelopment area. Between 1995 and May of 1997, the URA acquired forty-six of the properties via amicable agreements with the owners of those properties. Appellant was the lone holdout.

On May 9, 1997, the URA filed a declaration of taking to acquire title to the Property. Appellant promptly filed preliminary objections to the declaration of taking. Appellant alleged, *inter alia*, that the proposed condemnation violated Appellant's free expression rights as guaranteed by the First Amendment of the U.S. Constitution and by Article I, Section 7 of the Pennsylvania Constitution.[5] In October of 1997, the

5. Appellant raised other objections; none of these other objections is at issue in the present appeal.

trial court granted in part and denied in part the URA's preliminary objections.[6]

Several years passed. During this time, extensive discovery ensued, hearings were held and lengthy briefs were filed.[7] On April 18, 2002, the trial court entered an order overruling the remaining objections to the declaration of taking filed by Appellant. In pertinent part, the trial court rejected Appellant's claim that the taking violated its free expression rights. First, the trial court found that the URA's proposed taking of the Property was for a content-neutral reason unrelated to the expression of free speech. Tr. ct. slip op. at 14. It thus rejected Appellant's argument that the proposed taking must be examined pursuant to the onerous strict scrutiny test.

The trial court determined that as strict scrutiny did not apply in the matter *sub judice*, then Appellant's free expression claim must be analyzed pursuant to the four-pronged intermediate scrutiny test first announced in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

6. In May of 1998, the Garden Theatre filed its own preliminary objections. The trial court dismissed the Garden Theatre's preliminary objections; on appeal, the Commonwealth Court affirmed. As noted in footnote 1, *supra*, the PAA filed with this court presented no issues with regard to the Commonwealth Court's decision that the Garden Theatre's preliminary objections were properly dismissed. Thus, the Garden Theatre is not a party in the appeal before this court.

We realize that our recognition that the Garden Theatre is not a party to this appeal could raise questions with regard to standing. Appellant does not run the adult movie theater and does not have an ownership interest in the Garden Theatre. It is merely the landlord. Thus, it is questionable whether Appellant has any standing with regard to a free expression claim when it is not engaged in the expression at issue. Yet, it is unnecessary for us to resolve this dilemma. Unlike the federal courts, where standing is a nonwaivable jurisdictional issue, the courts of this Commonwealth view the issue of standing as nonjurisdictional and waivable. *See Housing Authority of County of Chester v. Pennsylvania State Civil Service Comm'n*, 556 Pa. 621, 730 A.2d 935, 941 (1999). As the parties have not presented us with an argument with regard to Appellant's possible lack of standing, we need not consider this issue any further.

7. The trial court undertook a Herculean task with regard to this matter. As noted by the trial court, "[t]he filings in this case stand over three feet tall, in addition to some 500 exhibits. Counsel also submitted 450 pages of final briefs." Tr. ct. slip op. at 2.

The trial court found that the intermediate scrutiny test was satisfied. It therefore concluded that the taking passed constitutional muster.[8]

Appellant appealed to the Commonwealth Court, which affirmed. *In the Matter of Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 823 A.2d 1086 (Pa.Cmwlth.Ct. 2003). The Commonwealth Court noted that the trial court had found that the URA's action was not content-based; thus, the Commonwealth Court agreed with the trial court's determination that strict scrutiny was inapplicable to this matter. 823 A.2d at 1095.

Instead, the Commonwealth Court found that no constitutional scrutiny was applicable with regard to the federal claim. The Commonwealth Court arrived at this conclusion via application of the U.S. Supreme Court's decision in *Arcara v. Cloud Books*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). In brief, *Arcara* states that in some instances when a law of general applicability incidentally infringes on free expression, no First Amendment scrutiny is required. The court found that *Arcara* was applicable to this matter, and thus Appellant's federal free expression claim failed. In the alternative, the court also found that the URA's action was permissible when analyzed pursuant to the *O'Brien* intermediate scrutiny test.

Finally, the Commonwealth Court examined Appellant's claim that *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591 (2002) ("*Pap's II*")[9] mandates a finding that the URA's proposed taking violated Article I, § 7 of the Pennsylvania Constitution. In *Pap's II*, an Erie ordinance worked a complete ban on nude dancing. The *Pap's II* court found that since the content-neutral reason for this ordinance was bound

8. While Appellant had raised a Pennsylvania Constitutional free expression claim, the trial court did not provide a separate analysis of this issue.

9. *Pap's II* marked the second time the *Pap's* matter appeared before this court. The first decision was issued by this court in *Pap's A.M. v. City of Erie*, 553 Pa. 348, 719 A.2d 273 (1998); that decision was overturned by the U.S. Supreme Court. 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). The *Pap's* matter will be discussed at length *infra*.

up with a content-based reason, strict scrutiny was to be applied. The Commonwealth Court rejected this argument. First, it reasoned that *Pap's II* does not apply to an *Arcara*-type situation such as the one *sub judice* when the complained of governmental action was one of general applicability. Furthermore, the Commonwealth Court declared that even if it were assumed *arguendo* that *Pap's II* was applicable, its strict scrutiny test would be satisfied here.

Judge Friedman filed a concurring and dissenting opinion. She agreed with the majority that Appellant was not entitled to relief on its federal free expression claim. Her reasoning in support of this conclusion, however, was not in lockstep with that offered by the majority. She concurred that the condemnation was not a content-based act such that the federal strict scrutiny test applied, and that the *O'Brien* test was satisfied; she disagreed with the majority's assessment that *Arcara* immunized the URA's action from First Amendment scrutiny. Judge Friedman interpreted *Arcara* as exempting government action from First Amendment scrutiny only when the government was moving against unlawful activity. Judge Friedman suggested that *Arcara* was inapplicable to the instant matter because the URA filed the declaration of taking "only because the [Garden Theatre's] *lawful* showing of 'adult' movies added to the negative image of the Redevelopment Area." *Urban Redevelopment Authority of Pittsburgh*, 823 A.2d at 1099 (emphasis in the original).

Where Judge Friedman disagreed with the majority's conclusion was with regard to Appellant's state constitutional law claim. Relying on this court's decision in *Pap's II*, Judge Friedman stated that it was the duty of the court to speculate as to any unmentioned purposes of a governmental action and determine whether the goal of such a hidden agenda was the suppression of free speech. In the matter *sub judice*, Judge Friedman believed that the "unmentioned purpose of the taking was to eliminate the showing of 'adult' movies in the Redevelopment Area" and thus strict scrutiny should be applied. *Urban Redevelopment Authority of Pittsburgh*, 823 A.2d at 1099. Judge Friedman concluded that strict scrutiny

could not be met and thus Appellant was entitled to relief on its state constitutional law claim.

Appellant filed a PAA with this court, limited to the federal and state free expression constitutional law issues. We granted allocatur.

■ We must first set forth our scope and standard of review. We note that the United States Supreme Court has stated that in reviewing First Amendment cases, appellate court must conduct a review of the entire record. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). This dovetails with the plenary scope of review and the *de novo* standard of review which will be applied to the pure questions of law raised in this matter. *See First Citizens Nat'l Bank v. Sherwood*, 583 Pa. 466, 879 A.2d 178, 180 (2005). To the extent that a question is a mixed one of law and fact, our standard and scope of review are not quite so clear. *See Warehime v. Warehime*, 563 Pa. 400, 761 A.2d 1138, 1146 n. 4 (2000). (Saylor, J. concurring) (noting that "this Court has not articulated a universal standard of review applicable to mixed questions of law and fact"). *Commonwealth v. Gorby*, 587 Pa. 417, 900 A.2d 346, 364 (Cappy, C.J., concurring) (accord). With regard to such mixed questions, we announce that we will follow *Gentile's* directive to review the whole record. Furthermore, to the extent that factual findings and credibility determinations are at issue, we will accept the trial court's conclusions insofar as they are supported by the record. To the extent that that a legal question is at issue, a determination by the trial court will be given no deference and will instead be reviewed *de novo*. *See Gorby*, 900 A.2d at 364 (Cappy, C.J., concurring).

■ We now turn to addressing Appellant's claim that the URA's proposed taking violates the free expression clause of the First Amendment of the United States Constitution. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." [10]  U.S. Const.

10. The First Amendment's protection of freedom of expression is made applicable to the states through the Fourteenth Amendment. *See Fiske v. Kansas*, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927).

amend. I. The First Amendment's ambit of protection extends not just to the spoken or printed word but also to expressive actions. The high Court has made it plain that expressive acts are not placed outside of the First Amendment's protection simply because the nude human form is displayed. *Schad v. Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

■ When the government restricts expression due to the content of the message being conveyed, such restrictions are allowable only if they pass the strict scrutiny test. That test is an onerous one, and demands that the government show that the restrictions are "(1) narrowly tailored to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

Yet, strict scrutiny is not applied simply because a plaintiff raises a claim that its freedom of expression has been curtailed. The High Court has recognized that where the governmental regulation applies a content-neutral regulation to expressive conduct, strict scrutiny is an inappropriate test to apply. *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The test which is applied to such content-neutral regulations was first enunciated in the seminal case of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In *O'Brien*, the defendant was convicted of violating a statute which criminalized the act of destroying or mutilating a draft card. The defendant had burned his Selective Service registration certificate in order to convince people to adopt his anti-war beliefs. The defendant argued that the conviction could not stand as the statute criminalizing the destruction of draft cards ran afoul of the First Amendment.

In analyzing this claim, the *O'Brien* Court stated that where expressive and nonexpressive conduct are combined in the same activity, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88

S.Ct. 1673. The *O'Brien* Court decreed that such "government regulation is sufficiently justified" if:

1) Promulgation of the regulation is within the constitutional power of the government;

2) The regulation furthers an important or substantial governmental interest;

3) The governmental interest is unrelated to the suppression of free expression; and

4) The incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. 1673. The *O'Brien* Court found that all four prongs were met and thus denied the defendant relief.

In addition to the strict scrutiny and the *O'Brien* test, there is a third test, one which can fairly be denoted as the "no scrutiny" test. The High Court has decreed that in some instances a governmental action will not be subject to any First Amendment scrutiny even where a plaintiff asserts that the governmental action impacts on the plaintiff's freedom of expression. This principle of constitutional law was announced in *Arcara, supra.* In *Arcara,* the respondents were the owners of an establishment which peddled sexually explicit books and movies. Local authorities discovered that various illegal activities were occurring in the store, including prostitution and public lewdness. The district attorney then filed a complaint seeking a closure order to shut down the store. The respondents answered the complaint claiming, *inter alia,* that the closure order would violate their First Amendment rights to sell sexually explicit materials. The trial court and the intermediate appellate court denied the respondents relief. New York State's highest court, however, reversed; the court reasoned that *O'Brien* applied and that the closure order could not meet that four prong test.

The United States Supreme Court granted *certiorari* and reversed. The Court acknowledged that the closure order would impact on the respondents' sale of erotic material. *Arcara,* 478 U.S. at 706, 106 S.Ct. 3172. Yet, the Court did

not find that this effect alone brought the First Amendment into play. The Court reasoned that when the government enforces a regulation of general applicability, First Amendment scrutiny is not implicated even when the enforcement of such a regulation would have some effect on First Amendment-protected activities.

The *Arcara* Court carefully distinguished *O'Brien*. The Court noted that in *O'Brien*, "it was conduct with a significant expressive element [i.e., the burning of a draft card to convey disagreement with the war] that drew the legal remedy in the first place . . . ." *Arcara*, 478 U.S. at 706, 106 S.Ct. 3172. Such was not the situation in *Arcara*. The closure order was sought not because of the respondents' sale of erotic materials but rather because illegal activity was occurring on the premises. As the activity which drew the legal remedy had no expressive content, the *Arcara* Court reasoned that the *O'Brien* test did not apply.

In sum, we must determine which of three alternative tests should be applied to this matter: strict scrutiny, intermediate scrutiny, or the no scrutiny standard enunciated by *Arcara*. Appellant argues that the URA's action was content-based and the trial court's conclusion to the contrary is in error.[11] It thus asserts that the strict scrutiny test is applicable. It contends that the proposed condemnation of the Property is driven by the URA's desire to rid the Federal North neighborhood of adult entertainment. Appellant presents several different arguments in support of this claim. First, it asserts that the content-based purpose of the URA's action is conclusively established by the fact that following redevelopment, the Property will be used as an entertainment venue. Appellant states that the only thing which will change following the proposed redevelopment is that the nature of the expression will no longer be erotic in nature. Appellant declares that the inescapable conclusion is that the URA seeks

11. When a factfinder determines whether a government's action is content-based, it necessarily must make factual findings, credibility determinations, and apply legal principles. Thus. we find that such an issue raises a mixed question of law and fact.

the Property only because it seeks to suppress the erotic message presently being conveyed there.

The URA counters that this conclusion is not so inescapable as Appellant would have us believe, and instead asserts that the trial court's conclusion that the URA's action was content-neutral was a sound one. In support of this argument, the URA notes that it introduced evidence before the trial court that there were excellent, content-neutral reasons to take the Property and yet utilize it post-redevelopment for entertainment other than the showing of adult movies; namely, such a proposed use for the Property would reinvigorate the economy of the Federal North area in a fashion that would not occur if the Garden Theatre continued its operation. Pursuant to the Redevelopment Plan, the Property would be the venue for a variety of cultural events which would be much broader in scope and appeal than the entertainment presently offered by the Garden Theatre. It reasons that employing the Property in such a fashion would significantly increase the number of people who frequent the Federal North area which in turn would improve the economic condition of the neighborhood. The URA's argument is sound and effectively guts Appellant's claim that the Redevelopment Plan's proposed reuse for the Property ineluctably leads to the conclusion that the proposed taking is content-based.

Appellant also claims that the content-based nature of the URA's action is proven by the URA's acknowledgement of the general perception that the Garden Theatre's showing of adult movies added to the overall negative image of the Federal North area. This argument fails. The URA was simply acknowledging that the public perceived the Garden Theatre as adding to the general negative image of the Federal North area; this acknowledgement did not negate the fact that the URA acted for content-neutral reasons.

Finally, Appellant asserts that various groups have long expressed disgust with regard to the Garden Theatre and have made several attempts to shut down the Garden Theatre. Appellant suggests that these other efforts to harry or eliminate the Garden Theatre establish that the Redevelopment

Plan was pretextual, and that the true goal was not urban redevelopment but suppression of commercial erotic expression. This argument is unpersuasive. The actions of which Appellant complains were committed by entities other than the URA. The fact that some segments of the public dislike erotic expression does not mean that all individuals and entities are united in an attempt to stymie this type of communication. Furthermore, we note that Appellant had the opportunity to present this argument to the trial court, and the trial court, after holding hearings and sifting through this staggeringly large record, clearly rejected Appellant's viewpoint as it explicitly found that the URA's proposed taking was content-neutral. Tr. ct. slip op. at 14. There is more than ample record support for the trial court's conclusion; thus, we see no reason to alter the trial court's finding on this point.

In the alternative, Appellant argues that even if we were to find that the taking was for a content-neutral reason, we should still apply strict scrutiny because the URA's taking effects a complete suppression on a certain type of expression. Appellant states that the Garden Theatre is the last adult movie theater in Pittsburgh and that if it is shuttered, it may not, due to zoning restrictions, reopen at another location as a matter of right. Appellant submits that if this were the case, the public's right of access to adult films will be denied.

■ Appellant is correct in stating that the First Amendment ensures not just that an individual may enjoy the satisfaction of being able to express himself; it also safeguard's "the public['s] access to discussion, debate, and the dissemination of information and ideas." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (footnote and citations omitted). A governmental action which would wholly foreclose the public's access to a certain form of expression would be most troubling—indeed, would arguably call for the application of the strict scrutiny test. Yet, this is not the type of situation with which we are confronted in the instant matter. In making its argument, Appellant myopically focuses on the possibility that closure of the Garden Theatre might effectively preclude Appellant from

operating an adult movie theatre in Pittsburgh. Yet, contrary to Appellant's supposition, closure of the Garden Theatre is not synonymous with a total denial of access to adult movies in Pittsburgh. There is no indication that without the existence of the Garden Theatre, the citizenry of Pittsburgh would be unable to access adult movies via other fora. Accordingly, we find no reason to apply the strict scrutiny test with regard to Appellant's federal free expression claim.

Having concluded that strict scrutiny should not be employed in resolving Appellant's federal free expression claim, we now must decide whether this claim should be resolved via application of the *Arcara* or *O'Brien* test. We turn first to an examination of *Arcara* for if we determine that *Arcara* applies, then no First Amendment scrutiny will be brought to bear on the URA's action and Appellant's federal free expression claim necessarily fails. If, however, *Arcara* is inapplicable, then the URA's action will instead be subject to *O'Brien's* intermediate scrutiny test.

We agree with the Commonwealth Court that *Arcara* controls this matter. The Urban Redevelopment Law, under which the Redevelopment Plan was crafted, is a law of general applicability. The Urban Redevelopment Law allows for the revitalization of blighted neighborhoods; a finding of blight is separate and apart from whether the properties in the blighted areas are used for free speech purposes. Also, the Redevelopment Plan did not single out the Property; rather, the Redevelopment Plan has a wide sweep, seeking the acquisition of every single property in a three square block area.

Furthermore, as was the situation in *Arcara*, the matter *sub judice* is distinguishable from *O'Brien*. In *Arcara*, the Court found it critical that government action was not in response to expressive conduct; this distinguished it from *O'Brien* where the government's act of prosecuting the defendant was sparked by the defendant's expressive act of burning a draft card. In the matter *sub judice*, the government acted not because of "conduct with a significant expressive element". *See Arcara*, 478 U.S. at 706, 106 S.Ct. 3172. Rather, it was to remedy the sapping effects of entrenched blight in the Federal

North area. Thus, we conclude that *Arcara* applies and, pursuant to *Arcara,* the *O'Brien* test is not implicated. As *Arcara* applies, no federal constitutional scrutiny will be brought to bear and Appellant's First Amendment challenge necessarily fails.

Appellant, however, rails against the application of *Arcara.* Appellant asserts that its challenge is not focused on a law of general applicability. Rather, it is opposing a proposed taking directed solely at the Property. Thus, Appellant asserts, the object of Appellant's contest is not of general application as the condemnation affects only the Property.

Appellant proposes an artificially blinkered analysis. The URA did not move against only the Property. Rather, the URA sought the Property via condemnation as part of the Redevelopment Plan in accordance with the Urban Redevelopment Law. The fact that the Property was the only parcel subject to condemnation proceedings does not go to show that the URA has an animus against businesses selling erotic products. Rather, it shows that Appellant, unlike the 46 other property owners, was unable to come to an amicable understanding with the URA. To put it bluntly, Appellant was the sole target of condemnation proceedings not because the URA singled out Appellant; rather, Appellant singled itself out. Furthermore, we note that adoption of Appellant's reasoning would have the ironic effect of rendering the *Arcara* rule internally inconsistent. In *Arcara,* the government sought to close a single adult bookshop; it did not seek the closure of multiple businesses simultaneously. Pursuant to Appellant's reasoning, the *Arcara* rule should not have been applied even in the *Arcara* matter itself. Obviously, such a line of reasoning is inherently flawed.

Another argument against application of *Arcara* to this matter was presented in the concurring and dissenting opinion in the Commonwealth Court below. The concurring and dissenting opinion declared that *O'Brien,* and not *Arcara,* should be applied in resolution of the federal constitutional law issue. It posited that *Arcara* is limited in scope, and applies only in those matters in which the government has acted in

response to illegal activity. As the URA's proposed taking was not motivated by any illegal activity occurring on the Property, the concurring and dissenting opinion stated that *Arcara* does not apply.

This is a strained reading of *Arcara*. While *Arcara* did deal with a situation in which the local government acted in response to illegal activity, this illegality was not the linchpin of the Court's decision. The crucial point in *Arcara* was that the actions which prompted the government to seek closure of the adult bookstore were nonexpressive in nature; this was the point on which the Court pivoted *Arcara* away from *O'Brien.*

Furthermore, it would be illogical to read into *Arcara* the requirement that the government *must* be acting against illegal activity in order for the government's action to escape *O'Brien* scrutiny. This is because on this point *O'Brien* and *Arcara* are not distinguishable but rather are in concert: in both matters, the governmental action was prompted by illegal conduct (in *O'Brien*, it was the destruction of a draft card while in *Arcara*, it was illegal sexual conduct). Thus, in attempting to determine whether *O'Brien* or *Arcara* applied, it would aid a court naught to examine whether the government's action was prompted in response to illegal action. The true distinguishing point was that in *O'Brien*, the act which invited the government to act was expressive in nature while in *Arcara*, the actions at issue were nonexpressive.[12]

▇▇▇ Appellant contends that even if the URA's proposed taking does not run afoul of the federal Constitution, our Commonwealth's Constitution would forbid it. In support of

12. We recognize that the Commonwealth Court, after finding that *Arcara* applied to this matter, also examined whether the URA's action met the *O'Brien* test. To the extent this case can be seen as more analogous to the secondary effects cases than to *Arcara, see City of L.A. v. Alameda Books, Inc.,* 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002); *City of Erie v. Pap's A.M.,* 529 U.S. 277, 299, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *City of Renton v. Playtime Theatres,* 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); we would agree with the Commonwealth Court that the intermediate scrutiny test set forth in *O'Brien* would be met here.

this argument, Appellant relies heavily on this court's decision in *Pap's II, supra.*

The *Pap's* matter was twice before this court. That dispute involved a City of Erie ordinance which stated that females over the age of ten must, when appearing in public, wear at least pasties and a G-string. *Pap's A.M. v. City of Erie,* 553 Pa. 348, 719 A.2d 273 (1998) (*"Pap's I"*). An owner of an erotic nude dancing establishment challenged the ordinance on state and federal free expression grounds. In *Pap's I,* this court limited its analysis to the federal free expression claim. We determined that even though Erie had provided the content-neutral reason that the ordinance was to combat the negative secondary effects associated with nude dancing, that content-neutral reason was "inextricably linked to the erotic message of the dance". *Pap's I,* 719 A.2d at 278. Thus, we concluded that the ordinance's stated content-neutral reason necessarily subsumed an unstated content-based reason. *Id.* at 279. The *Pap's I* court proceeded to apply strict scrutiny to the ordinance, and found that the ordinance did not pass that stringent test.

The U.S. Supreme Court granted *certiorari* and reversed. 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). While the High Court splintered on many issues with regard to that matter, a majority did agree that the Erie ordinance did not violate the federal Constitution. The Court remanded the matter to this court for consideration of the preserved state constitutional law claim.

On remand, this court determined that the Erie ordinance ran afoul of our Commonwealth's constitutional free expression provision. *Pap's II, supra.* The *Pap's II* court stated that for purposes of examining the state constitutional law claim, it was adopting the analysis of *Pap's I* with regard to whether the ordinance was content-based. Thus, the *Pap's II* court held that as one "obvious purpose" for the ordinance was suppressing the erotic message of nude dancing, the ordinance was content-based. *Pap's II,* 812 A.2d at 612. It thus applied the strict scrutiny test, which it also denominated the "least

intrusive means analysis", *id.*, and found that the ordinance did not pass constitutional muster.

The *Pap's II* court offered an additional rationale for its holding. It noted that Erie's ordinance worked a complete bar against nude, erotic dancing. The *Pap's II* court decreed that whenever the government acts to effect such a complete ban on a certain type of expression, strict scrutiny must be applied regardless of whether the government's action was content-based.

Contrary to Appellant's belief, *Pap's II* does not entitle Appellant to relief. In *Pap's II*, the ordinance at issue was content-based, designed to suppress expression. We have the opposite situation here. As noted by the trial court, the URA's action in seeking condemnation was content-neutral and unrelated to the suppression of freedom of expression. Furthermore, unlike the *Pap's* matter, there is no silent, content-based reason that is "inextricably linked" to the content-neutral reason of urban redevelopment. In the *Pap's* matter, the government viewed the negative secondary effects as being caused by the erotic message of nude dancing; thus, it could not logically be stated that an ordinance designed to combat negative secondary effects was distinct from suppressing the erotic message of the dance. Here, we have no such link. Similarly, *Pap's II* alternative "complete ban" analysis is not implicated in this case because the URA's taking of Appellant's property does not resemble the regulation in *Pap's II*, which effectuated a categorical ban on public nudity and thus the expressive act of nude dancing. Thus, Appellant's claim that *Pap's II* entitles it to relief on its state constitutional law claim fails.[13]

13. While we have concluded that *Pap's II* does not compel the application of the strict scrutiny test to the URA's action, we would be remiss if we did not respond to a point of reasoning offered by the responsive opinion in the court below. That responsive opinion posited that combating urban blight was not a "compelling" interest because the Federal North area had been blighted for decades prior to the URA's proposed taking of the Property. Essentially, the responsive opinion below expressed the belief that the URA's interest could not have been a compelling one otherwise it would have acted earlier.

For the foregoing reasons, we affirm the order of the Commonwealth Court.

Justice NEWMAN and Justice EAKIN and BAER join the opinion.

Justice NIGRO did not participate in the decision of this matter.

Justice SAYLOR files a dissenting opinion in which Justice CASTILLE joins.

Justice SAYLOR, dissenting.

I believe that the Pittsburgh Urban Redevelopment Authority's taking of the subject property, in order to alter the type of entertainment provided there, burdened protected expression, thus triggering strict scrutiny under Article I, Section 7 of the Pennsylvania Constitution. Thus, I would remand the matter to the trial court for a determination of whether the government's actions constitute the least restrictive means to accomplish its objectives. My reasoning follows.

The majority finds that the decision of the Urban Redevelopment Authority ("URA") to condemn the New Garden Theatre (the "Theatre") was unrelated to the content of the speech occurring on its premises, and therefore, that no constitutional scrutiny is necessary pursuant to *Arcara v. Cloud Books,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). The majority also determines that the protections embodied in Article I, Section 7 of the Pennsylvania Constitution, as interpreted by this Court in *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002) *("Pap's II"),* are inapplicable to the present matter. I respectfully differ with the majority on both of these points.

This reasoning is flawed. Urban blight is a serious problem which unfortunately affects many of this Commonwealth's cities. It saps our once-vibrant neighborhoods. The government unquestionably has a compelling interest in combating this problem. This interest is not diminished simply because a plan was not omnisciently put into action at the very onset of a neighborhood's slide into decay.

First, as to federal law, it is noteworthy that, to support its position that First Amendment protections are irrelevant to the present controversy, the majority states that the URA adduced evidence that its proposed use—namely, providing entertainment of a different variety from "adult" films—would "reinvigorate the economy of the Federal North area in a fashion that would not occur if" the Theatre continues to offer its present fare, and that these new forms of entertainment would be "broader in scope and appeal" than the old films, thus increasing the economic vitality of the neighborhood. Majority Opinion at 444, 913 A.2d at 185. While these effects may be socially beneficial, they depend entirely upon changing the type of speech taking place at the Theatre. Under the Supreme Court's prevailing precedent, therefore, even if one accepts that the URA's actions and motivations were unrelated to the suppression of free expression—*i.e.*, that the taking pertains exclusively to the perceived secondary effects of the speech at issue—the First Amendment requires judicial scrutiny, including an inquiry into whether the challenged governmental action allows for reasonable alternative avenues for the communication of the affected speech. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29 (1986); *see also City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 440, 122 S.Ct. 1728, 1738, 152 L.Ed.2d 670 (2002) (observing that *Renton* requires that municipal ordinances restricting speech be subject to intermediate scrutiny if they are content neutral); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 299, 120 S.Ct. 1382, 1396, 146 L.Ed.2d 265 (2000) (recognizing that Erie's facially content-neutral restriction on public nudity, which had the effect of banning the expressive conduct of nude dancing, could be justified based upon the "secondary effects" of the speech so long as the ordinance satisfied the intermediate-scrutiny standard set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (observing that content-neutral restrictions on speech are only valid if they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a signifi-

cant governmental interest, and leave open ample alternative channels for communication of the information); *Turner Broadcasting Sys. v. FCC*, 520 U.S. 180, 185, 117 S.Ct. 1174, 1184, 137 L.Ed.2d 369 (1997) (explaining that content-neutral speech restrictions are evaluated under intermediate scrutiny).[1]

Moreover, *Arcara* is inapposite to the present case, as Judge Friedman recognized in her responsive opinion on appeal. *See URA*, 823 A.2d at 1098–99 (Friedman, J., concurring and dissenting). The *Arcara* Court determined that the First Amendment does not protect parties from criminal and civil sanctions imposed as the result of unlawful activity occurring on a property simply because some protected speech also happens to occur there. *See Arcara*, 478 U.S. at 705 n. 2, 106 S.Ct. at 3177 n. 2 (observing that the closure of the book store based on health code violations "ha[d] nothing to do with any expressive conduct at all"). Indeed, a careful reading of that decision reveals that its holding was motivated by the Court's concern that the First Amendment not be used as a "cloak for obviously unlawful public conduct." *Arcara*, 478 U.S. at 705, 106 S.Ct. at 3176.[2]

1. As to reasonable alternative avenues of communication, neither the trial court nor the Commonwealth Court resolved whether Appellant could relocate the Theatre. The trial court likewise did not determine whether the type of speech at issue would be entirely eliminated in the City of Pittsburgh, while the Commonwealth Court stated that "reasonable alternatives of communication" would not be eliminated because the city has video booths for individual movie viewing as well as adult movie rental outlets. *See In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 823 A.2d 1086, 1096 (Pa.Cmwlth.2003) *("URA ")*. This statement, however, appears to reflect speculation on the part of the Commonwealth Court; moreover, it is not readily apparent that such modes of communication are qualitatively identical to the display or viewing of large-screen motion pictures.

2. *See, e.g., Arcara*, 478 U.S. at 707, 106 S.Ct. at 3178 ("Bookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises."); *see also id.* at 705, 106 S.Ct. at 3176–77 ("If the city imposed closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment, the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist."); *id.* at 706, 106 S.Ct. at 3177 ("One liable for a civil damages award has less money to spend on paid

In the present dispute, by contrast, the URA does not contend that the Theatre is engaged in any unlawful conduct or that the activities occurring on the premises otherwise make it a threat to public safety or subject it to civil liability. Additionally, whereas in *Arcara* the activities that formed the basis of the governmental action (prostitution, lewdness, etc.) were unrelated to any expressive conduct, here, the basis for the government's action relative to the Theatre is centered on controlling the speech itself. Thus, while the URA may legitimately desire to enhance the economic and social conditions extant in the neighborhood, it is the content of the speech that concerns the URA in light of its judgment that, unless such speech is altered in conformance with its overall plan, the economic goals in question will not come to fruition. In short, unlike the bookstore in *Arcara*, the Theatre is not attempting to use First–Amendment guarantees as a pretext to avoid sanctions for non-expressive conduct.

Apart from any First Amendment concerns, moreover, the majority determines that the protections embodied in Article I, Section 7 of the Pennsylvania Constitution, as interpreted by this Court in *Pap's II*, do not apply to the present matter. While the majority states, in this regard, that the situation under review is the "opposite" of that involved in *Pap's II*, Majority Opinion at 450, 913 A.2d at 189, in my view *Pap's II* is directly on point. In particular, I would find that the Commonwealth Court erred in failing to consider the "unmentioned purposes" of the taking as required by *Pap's II*, and would further conclude that the unmentioned purposes apparent on the existing record require a conclusion that the taking was content-based for purposes of our state Constitution.

As the majority explains, *Pap's II* involved the question of whether Article I, Section 7 was violated by Erie's public

political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim."); *id.* ("[A] thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement, but we have explicitly rejected a prisoner's claim to a prison environment least restrictive of his desire to speak to outsiders.").

indecency ordinance, which was enacted to ban nude live entertainment by making it a summary offense to appear in public in a state of nudity. In resolving this question, the *Pap's II* court acknowledged the established principle that Section 7 "provides greater protection of expression than its federal counterpart." *Id.* at 392, 399, 812 A.2d at 601, 605; *see Norton v. Glenn*, 580 Pa. 212, 228, 860 A.2d 48, 57 (2004); *Commonwealth, Bureau of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy*, 556 Pa. 268, 275, 728 A.2d 340, 343–44 (1999). It also acknowledged—as it had to do in light of the Supreme Court's decision remanding the matter to this Court—that the city's stated content-neutral purpose of combating the socially undesirable activity that it believed was aggravated by the existence of nude dancing establishments subjected the ordinance only to intermediate scrutiny under the United States Constitution. Critically, however, the *Pap's II* court explained that the primary difference between this Court's approach under Article I, Section 7, and judicial review pursuant to the First Amendment, is that, when a claim is raised under the state charter, the reviewing court must consider whether there is an "unmentioned purpose" of burdening protected expression that is "inextricably bound up with" the government's valid, content-neutral objective. *See Pap's II*, 571 Pa. at 405, 812 A.2d at 609.[3] If so, then the broader protections of Article I are implicated and the governmental action is subjected to strict scrutiny.[4]

[3.] It is undisputed that the taking here at issue burdens protected speech, as non-obscene motion pictures represent a constitutionally-protected form of expression, *see Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952); *Commonwealth v. Guild Theatre, Inc.*, 432 Pa. 378, 381, 248 A.2d 45, 47 (1968), and the URA does not contend that the films shown at the Theatre are obscene. *Cf. Pap's II*, 571 Pa. at 394, 812 A.2d at 602 (noting that, although it may not "ascend to the level of high art form," nude dancing is constitutionally protected expression).

[4.] Were this an issue of first impression, I would favor application of a modified *O'Brien* standard, *see O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679, as outlined in my responsive opinion in *Pap's II*. *See Pap's II*, 571 Pa. at 412, 812 A.2d at 613 (2002) (Saylor, J., dissenting) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 310–13, 120 S.Ct. 1382 1402–04, 146

The majority presently states that the *Pap's II* construct is inapplicable for the same reason that it believes *Arcara* applies, namely, that the URA's decision to condemn the Theatre was content neutral. *See* Majority Opinion at 450, 913 A.2d at 189. What this analysis overlooks is that, even if the taking could be considered content neutral for *federal* purposes, it may still be content based for purposes of the *state* Constitution. Indeed, this was the very point of *Pap's II*, in which this Court explained at length that solely relying upon the government's content-neutral "stated purpose" for its actions—and ascertaining the level of scrutiny accordingly (as would be appropriate under the First Amendment)—could not fully effectuate the protections contained in the state charter. *See, e.g., Pap's II,* 571 Pa. at 408, 812 A.2d at 611.

Here, the URA's "stated purpose" for condemning the Theater (namely, to carry through with its plan to revitalize the neighborhood) is undoubtedly content neutral and valid, but it is equally obvious that its action was also grounded upon an "unmentioned purpose" of altering the content of the speech that occurs on that property. This is particularly apparent because the URA did not intend to demolish or otherwise change the function of the Theatre, but planned only to replace the current "adult"-content motion pictures with alternate events and performances that would conform to the URA's overall plans for the neighborhood. *See, e.g., In re Condemnation by Urban Redevelopment Auth. of Pittsburgh,* No. GD 97–7170, *slip op.* at 7 (CCP Allegheny County, April 18, 2002) (reciting the plan to "reuse" the Theatre "as a performing arts, cultural and community activities venue with live performance, music, dance and theater . . . ."); *id.* at 8 (observing that these same proposed new uses were included in the redevelopment master plan).

The majority avoids this critical point by focusing instead on the broader propositions that the URA's enabling legislation is a content-neutral law of general applicability, that urban revitalization efforts are not inherently speech burdening, and

L.Ed.2d 265 (2000) (Souter, J., concurring)). As this is not an issue first impression, I am bound by the judgment of the *Pap's II* majority.

that the present effort has "wide sweep" in seeking the acquisition of all properties in the targeted area. Majority Opinion at 446, 913 A.2d at 187. This position is not entirely persuasive in the context of the present case, however, as the only property at issue is the Theatre, and the only governmental action at issue is the taking of it, since all other properties have been acquired amicably, *see* Majority Opinion at 436, 913 A.2d at 181; moreover, it is evident that if the URA were assured that the Theatre would be used for the cultural and educational events envisioned by the URA under present ownership, the URA would have no need to take it, as the URA's goals could be achieved without doing so. Thus, the URA's decision to take the Theatre is inescapably bound up with its perceived need to alter the type of speech that would otherwise occur there if it did not take the property.[5] In this sense, I find a direct analogy between the present dispute and *Pap's II,* where the City of Erie's content-neutral end of reducing the negative secondary effects associated with nude live entertainment was valid and content neutral, but such purpose was "inextricably bound up with" the content-based objective of suppressing "the erotic message of the dance." *Pap's II,* 571 Pa. at 405, 812 A.2d at 609. Under *Pap's II,* then, I would uphold the taking only if it satisfies strict scrutiny, that is, if it constitutes the least intrusive means of furthering a compelling state interest.

Applying the standard presently, I would conclude that the URA has a compelling interest in redeveloping blighted urban areas, and thus, that the taking can be upheld if it is "narrow-

5. The record also supports this content-based underlying rationale. For example, the Conditions Report that formed the basis for the revitalization plan noted that the presence of an adult theater adds to the "negative image" of the area. *See In re Condemnation by Urban Redevelopment Auth. of Pittsburgh,* No. GD 97–7170, *slip op.* at 3 (CCP Allegheny County, April 18, 2002). Additionally, Angalo Taranto, the URA project manager for the Federal North Redevelopment Project, testified at trial that the URA's desire to acquire the Theatre related to the "image problem" caused by the Theatre's "undesirable uses." N.T. April 3, 2000 at 634. In the face of this evidence, the majority's suggestion that there is "no link" between the URA's content-neutral stated purpose for acquiring the Theatre and the speech which would

ly tailored to meet that compelling interest," that is, that there are no "less intrusive, practicable methods available" of doing so. *Pap's II*, 571 Pa. at 410, 812 A.2d at 612 (internal quotation marks omitted). The trial court did not make any findings on this latter question, as it concluded that the taking was not content based in the first instance.[6] The Commonwealth Court, which issued its decision after *Pap's II*, noted the issue, but supplied a less-than-convincing analysis. In particular, the court suggested that the URA's expertise in such matters is beyond question, and that because the URA had stated that it could not fully effectuate its plan without taking the Theatre, there must have been no other means available to it that were less restrictive of free speech. *See URA*, 823 A.2d at 1097–98. Notably, the court's statement in this regard was brief and conclusory, and it failed to reference the record or any authority for support.[7]

In view of the above, and considering the size of the record and the sheer volume of testimony, I would refrain from making a judgment at the appellate level on whether the least-restrictive-means prong of strict scrutiny has been satisfied. Instead, I would remand the matter to the trial court so that it can make the necessary factual findings to resolve whether there are less intrusive, practical measures available to accomplish the URA's redevelopment goals, and instruct it to take into consideration whether any alternative avenues for the type of expression targeted for elimination from the Federal

be suppressed is unpersuasive. *See* Majority Opinion at 450, 913 A.2d at 189.

6. The trial court issued its opinion before *Pap's II* was decided.

7. Indeed, neither the Commonwealth Court nor the trial court indicated that the URA considered the feasibility of an alternative plan which would allow the Theatre to continue in its present usage, or otherwise showed that redevelopment could not be accomplished without acquisition of the property. Further, certain trial testimony indicates that the URA never considered such an alternative or sought the Theatre's participation in redevelopment activities. For instance, when a URA official was asked whether the URA had made "any effort at all to learn of anybody who would have redeveloped that block with the adult theater in place," he admitted that it had not. N.T. April 3, 2000, at 634. The same official stated that one reason the URA decided to condemn the Theatre was that it was not an economic generator in the neighborhood; he admitted, however, that the URA had not undertaken any efforts to assess the Theatre's economic contributions. *See id.* at 476, 812 A.2d 591.

North neighborhood would remain within the city if the Theatre were taken by the URA.

Justice CASTILLE joins this dissenting opinion.